UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| K.R. SMITH TRUCKING L.L.C., Plaintiff, | ) |
| vs. | ) Case No. 8-CV-01351-WEB-DWB |
| PACCAR Inc, and PETERBILT MOTORS COMPANY, a division of PACCAR Inc, and WESTERN PETERBILT, INC., Defendants. | ) |

D E P O S I T I O N

The deposition of KENNETH R. SMITH taken on behalf of the Defendants, Paccar Inc and Peterbilt Motors, pursuant to the Federal Rules of Civil Procedure before:

VESTA L. YORK, CSR, CRR
KELLEY, YORK & ASSOCIATES, LTD.
Suite 220, 200 North Broadway
Wichita, KS 67202

a Certified Shorthand Reporter of Kansas, at Suite 265, 727 North Waco, Wichita, Sedgwick County, Kansas, on the 27th day of January, 2010, at 9:11 a.m.

APPEARANCES

PLAINTIFF:
LAW OFFICES OF ELDON L. BOISSEAU, L.L.C.
Mr. Eldon L. Boisseau
River Park Place
727 North Waco, Suite 265
Wichita, KS 67203
(316) 613-2800; (866) 212-6888
Fax: (316) 613-2801
eldon@boisseau.com

DEFENDANTS PACCAR Inc and PETERBILT MOTORS COMPANY:
HINKLE ELKOURI LAW FIRM L.L.C.
Ms. Amy M. Decker
Suite 200
8621 East 21st Street North
Wichita, KS 67206-2991
(316) 660-6511
Fax: (316) 631-1725
adecker@hinklaw.com

DEFENDANT WESTERN PETERBILT, INC.:
WALLACE, SAUNDERS, AUSTIN, BROWN & ENOCHS, Chtd.
Mr. Patrick J. Murphy
400 O. W. Garvey Center
200 West Douglas
Wichita, KS 67202
(316) 269-2100
Fax: (316) 269-2479
pmurphy@wsabe.com



INDEX


| KENNETH R. SMITH | Page |
|---|---|
| Direct Examination By Ms. Decker | 5 |
| Cross-Examination By Mr. Murphy | 90 |
| Redirect Examination By Ms. Decker | 115 |
| Recross Examination By Mr. Murphy | 118 |
| Further Direct Examination By Ms. Decker | 123 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | March 28, 2005, Western Pacific Leasing, Inc., Sales Invoice and Lease Agreement (6 pgs.) | 5 |
| 2 | March 28, 2005, Disclaimer of Warranty Agreement (1 pg.) | 5 |
| 3 | 7/7/04 Peterbilt Motors Company Warranty Agreement (2 pgs.) | 5 |
| 4 | Copy of color photograph (1 pg.) | 5 |
| 5 | Copy of color photograph of tractor damage (1 pg.) | 5 |
| 6 | Copy of color photograph of tractor damage (1 pg.) | 5 |
| 7 | Interrogatory responses to PACCAR and Peterbilt Motors (14 pgs.) | 35 |
| 8 | 1/2/07 Western Peterbilt Invoice (1 pg.) | 75 |
| 9 | 5/18/07 Peterson CAT Invoice (1 pg.) | 75 |
| 10 | 6/6/07 Cashman CAT Invoice (1 pg.) | 75 |
| 11 | Peterson CAT Invoice (1 pg.) | 75 |
| 12 | 6/6/07 Cashman CAT Invoice (1 pg.) | 75 |
| 13 | 8/25/07 Rush Truck Center Invoice (1 pg.) | 75 |
| 14 | 8/25/07 Rush Truck Center Invoice (1 pg.) | 75 |
| 15 | 9/8/07 Harveys Truck Repair Invoice (1 pg.) | 75 |
| 16 | March 29, 2005, Western Pacific Leasing Truck Delivery Receipt (1 pg.) | 101 |
| 17 | March 14, 2005, Western Peterbilt Customer Purchase Order (1 pg.) | 103 |
| 18 | March 28, 2005, Western Pacific Leasing Long Term Lease Purchase Option Agreement (2 pgs.) | 106 |







| | |
|---|---|
| Signature of Witness | 125 |
| Certificate | 126 |

Page 5

(Deposition Exhibit Nos. 1 through 6 were marked for identification.)

KENNETH R. SMITH,

having been first duly sworn on his oath to state the truth, the whole truth, and nothing but the truth, testifies as follows:

DIRECT EXAMINATION

BY MS. DECKER:

Q. State your name for the record.
A. Kenneth R. Smith.
Q. And what's your address, Mr. Smith?
A. 812 Sunny Glen Way, two words, Sunny Valley, Oregon.
Q. Mr. Smith, I think you told me to call you Kenneth. Is that okay?
A. Ken.
Q. Okay, Ken. Have you ever been deposed before?
A. No.
Q. Okay. I'm sure that you've talked to Mr. Boisseau and he's told you how this whole process will work today; is that right?
A. Yeah, he tried, yes.
Q. Well, I'm just going to kind of hit some of the highlights of the things that I want you

Page 6

to remember as we're going through the deposition today, okay?
A. Okay.
Q. For one thing, if you don't understand a question that I ask you, please stop and ask me to clarify; is that okay?
A. Okay.
Q. Because, I, like everyone else, can torture the English language at times, and I'm sure that you won't understand every question that I ask, so I won't be offended if you say "Please restate the question," okay?
A. Okay.
Q. And I also will represent to you that I'm representing two of the defendants in this case, one of them is Peterbilt Motors Company and the other one is PACCAR, okay?
A. Okay.
Q. And so there are going to be times today when I ask you questions that relate only to Peterbilt or PACCAR or sometimes to Mr. Murphy's client, okay? Do you understand that?
A. Sure.
Q. Okay. And so if you don't understand which

Page 7

particular defendant that I'm asking about, will you please tell me so I can clarify it for you?
A. Okay.
Q. Okay. And if you answer a question, I'm going to assume that you have understood the question; is that fair?
A. Yep.
Q. Okay. And that's another thing I was going to tell you, that we'll have to make sure that you say yes and no rather than nod your head because Vesta's taking down everything we say today, okay?
A. Right.
Q. And if you need a break, just let me know and we'll take a break and we'll come back, okay?
A. Good.
Q. Okay. It's my understanding, Ken, that the you are a truck driver; is that correct?
A. A trucker, yes.
Q. And then you own your own business; is that correct?
A. Yes.
Q. Can you tell me a little bit about your business and how you get your business?

Page 8

A. Where do you want to start?
Q. Tell me currently. Let's start with currently.
A. Okay. It's listed as K.R. Smith Trucking, LLC, and I do mostly oversize, overweight loads.
Q. And where do you do the loads?
A. Every state in the country except north of Pennsylvania. I don't do that.
Q. And do you have any employees of your business?
A. Just my wife and I.
Q. Does your wife also drive a truck?
A. No.
Q. What is your wife's role in the business?
A. Pardon me? Oh, she likes to call herself the CFO, chief financial officer. She finds my loads for me. She does most of the paperwork in the office at home, and I do a lot of the paperwork myself that's on the road: Receipts, bills of lading, that kind of thing. And I do the -- I send the bill out to -- so I get paid, and then she follows up on it to make sure we get paid.
Q. And how is it that you get your business?

Page 9

You said that your wife gets your business.
How does she do that?
A. Internet. She does it on the Internet.
Q. Does she advertise on the Internet?
A. No.
Q. So how on the Internet does she do that?
A. We have three or four websites that we look at. We look at getloaded, Truckstop Internet, landstar, and DAT. Those are the websites we use.
Q. And do those websites list loads that they have --
A. Yes.
Q. -- is that how that works?
A. Yes, they do.
Q. And then what happens after a load is listed on the Internet?
A. I will -- she will call me and tell me about the load, and I'll tell her whether or not I'm interested in it. If it pays enough money, then I will call the dispatcher on that load and he will describe it to me, he or she will describe it to me, and then I have to make a decision whether it's worthy enough to haul.

Page 10

Q. And so, for instance, if you're in Kansas and there's a load listed in the general vicinity, you'll make a determination whether it's feasible and economical for you to go get the load?
A. I was looking this morning and what I do is I look at Wichita, Kansas, and a 500-mile radius, and if I see a load that I'm interested in, I will call them or my wife will call them, both of us do that, and if the load is of interest, then we will determine whether we want to haul it or not.
Q. Okay. And you said that that's currently how your business is set up is through the LLC. How long has it been K.R. Smith Trucking, LLC?
A. Approximately four years.
Q. And what was it before that?
A. Just K.R. Smith.
Q. So it was just you individually doing business as K.R. Smith Trucking?
A. Correct. My wife and I, yes.
Q. And how long did you operate as just K.R. Smith Trucking?
A. From 1992.

Page 11

Q. What did you do before that?
A. Before trucking?
Q. Well, before 1992. Did you do something other than trucking?
A. Oh, yeah. I drove a truck for Chuck Case in San Diego.
Q. And what type of business was that?
A. Trucking.
Q. What did Chuck Case do, though; I mean what type of loads?
A. We hauled dirt, asphalt.
Q. So was it in the same type of truck as you were used to driving in your own business?
A. It was a two-axle Kenworth conventional with two trailers, two bottom-dump trailers.
Q. And approximately how long did you work for Chuck Case?
A. Oh, two years.
Q. Before that, were you in the trucking industry as well?
A. I started in 1970, if that helps.
Q. And since 1970, you've been involved in some aspect of the trucking industry?
A. Yes.
Q. And has it always been as driving a truck?

Page 12

A. Yes.
Q. In your role as the truck driver, have you ever engaged in maintaining the trucks that you drive?
A. Every day.
Q. And what would an every day maintenance be?
A. Well, you have to inspect the truck to make sure it's worthy, road worthy. You have to check the lights, the brakes, the steering, the engine, water, oil. Generally make sure that it is road worthy.
Q. And that's something that you do every day?
A. Every day.
Q. Okay.
A. Every time I get out of the truck, I check the truck.
Q. What about repairs, do you do the actual repairs?
A. I do minor repairs.
Q. What would those entail?
A. Oh, something like lights. I don't know what to tell you.
Q. Do you change the oil?
A. I have, yes. As a rule now, I have it done at a truck stop, or I prefer a company called

Page 13

Bee Line there in Texas.
Q. Why do you prefer Bee Line?
A. Because they're clean, they're neat, they do a clean job. I also do the TA Truck Stops and the Petro Truck Tops for my, I call it LOF, lube, oil and filter. And they also -- I insist that they inspect the truck at the time for brakes, anything they can find that might need attention.
Q. I want to turn now, and I apologize, I'll probably skip around here today and I'll try to make this coherent, but I want to turn now to your purchase of the truck that is at issue in this particular lawsuit, okay?
A. Okay.
Q. And can you tell me what were the circumstances that led up to you purchasing that particular truck?
A. I have a friend, his name is John Gustafson, he had bought a truck from Western Peterbilt, and he recommended that they were a very good, reputable agency. So I went up and looked at the truck, looked at several trucks. I like pearl black. It's one of my favorite colors. This truck was pearl black.

Page 14

And I talked to, I believe the salesman's name was Ron, if I can remember correctly. And he presented the truck to me and it looked like a good truck.
Q. At the time that you started looking at this truck, did you own another truck?
A. Yes, I did.
Q. And why did you decide to purchase a new truck?
A. Because my 3 -- my 1999 379 Pete had 850,000 miles on it, so I was ready for a new one.
Q. So you've previously owned a Peterbilt?
A. I've only owned Peterbilts.
Q. Okay.
A. Never owned anything else.
Q. How many miles did you say it had on it?
A. 850,000.
Q. Had you purchased that truck new?
A. I ordered that truck. It took me a year to get it.
Q. So it had 850,000 miles on it and you decided it was time to start looking for a new truck?
A. Right.
Q. And your friend, John Gustafson, recommended the Western Peterbilt dealership?

Page 15

A. Right.
Q. And how far is the dealership from your home in Oregon?
A. How far is Spokane? Oh, man, 600 miles.
Q. So did you have a means of looking at their inventory at Western Peterbilt prior to going to the dealership?
A. No.
Q. This was a special trip to the dealership?
A. I took a load up there.
Q. Okay.
A. I asked my dispatcher to find a load for me. I was leased to Gordon Trucking at that time. I asked him to find me a load to that area so I could look at trucks. That's not the only place I looked.
Q. I'm just going to ask you because it's in my mind right now, when you say you leased to Gordon Trucking, what does that mean?
A. That means my truck was leased to them as an owner operator. It's a pretty common practice. Big companies have owner operators lease to them. I was there for nine and a half years.
Q. So you not only worked with Gordon Trucking,

Page 16

you also had your own business?
A. It was my business. They found all my loads for me.
Q. Okay.
A. Okay. They were -- I was working exclusively for them.
Q. Okay. I see what you're saying.
A. Okay. I was on what they call a dedicated run. Did the same thing all the time.
Q. What's a dedicated run?
A. I would run from Halsey, Oregon, to Phoenix, Arizona. Normally, I would pick up in the Phoenix, Arizona, area, come back to Halsey, drop the trailer, and then another truck would pick it up and go on, and then I would get another load from Halsey and go back.
Q. Okay. And you said you looked at other places for a truck?
A. Uh-huh.
Q. What other places had you looked?
A. DSU Peterbilt in Medford.
Q. Had you looked at any particular trucks at DSU?
A. Peterbilts, 379s.
Q. Was there a particular one at that

Page 17

dealership --
A. No.
Q. -- that you had your eye on?
A. No. They don't do owner operator trucks, as a rule.
Q. So when you had the load in the vicinity of Western Peterbilt, was that your first contact that you had with Western Peterbilt about purchasing a truck?
A. Uh-huh, yes.
Q. And do you recall when that was?
A. No.
Q. When you had your first contact with them, I believe you said in some interrogatory responses there was like a three-day period where you were talking to them about purchasing this truck?
A. Approximately three days, yes.
Q. And was that the same time? This isn't a very clear question --
A. No.
Q. -- but when you went there the first time to look at this black truck, is that when your negotiations started or did you go back home, think about it and then come back to the

Page 18

dealership?
A. I don't remember.
Q. Okay. And you believe you dealt with a Ron?
A. Ron.
Q. Okay.
A. Christenson. How about that?
Q. I assume buying a truck is not like buying a car, you don't just cruise around a lot and you have a salesperson come out? How did that whole process work?
A. Just like buying a car.
Q. It was just like buying a car?
A. It's no difference.
Q. Had you worked with Ron Christenson before?
A. Never met him before.
Q. And what was your understanding as far as who Ron was working for?
A. Western Peterbilt.
Q. So what was your initial contact with Ron, as far as what were your conversations? Were you telling him what you were looking for and he was trying to help you, or had you already spotted the black truck at the time and said, "Hey, tell me about this black truck"?
A. No. It's like looking at a car. You just

Page 19

walk around a lot and look at trucks or cars. It's the same thing. You just look around, see what catches your eye, and that caught my eye because, like I said, I like the pearl black. There was a yellow 379X that caught my eye, but I didn't have $130,000 to spend.
Q. Was the yellow truck new or was it used?
A. New.
Q. Were there questions that you asked Ron or did he tell you things about the truck? How did you find out about the particular characteristics of this truck?
A. He told me that that truck had been pulling for Boeing Aircraft, and knowing Boeing Aircraft, it pulled light loads. They were not very heavy at all. That truck had low mileage on it. It was leased to Boeing Aircraft and it was a return. They were finished with it.
Q. Do you recall approximately how many miles it had on it?
A. No. It was a low mileage truck, I remember that.
MR. BOISSEAU: You better tell her what you mean by low mileage. Give her

Page 20

some idea what that is.
Q. Was it the under 100,000?
A. That, I can't remember. My truck that I have now, when I bought it had 170,000 on it. That's low mileage.
Q. To you that's low mileage, 170,000?
A. Right. I don't think that truck even had that many, but I can't remember.
Q. Did you drive the truck?
A. Yes.
Q. The first time you went to the dealership?
A. I don't think so. I think it was a day before I drove it.
Q. So can you just tell me what happened on your initial visit to the dealership, then.
A. Trucks are -- unlike used cars, you look at them. You don't have to drive them. It had an 18 speed in it. It had a 3406 Cat engine in it and it had -- I'm trying to remember the gear ratio. They were 336 gear ratios, which is good because my previous truck was 325. It did not have -- it wasn't -- it didn't look like this. It wasn't gussied up, I guess you'd call it. I don't know how to explain that.

Page 21

Q. I'm just going to follow up on a question. What's the difference in the gear ratios? You seemed to me that would be a big deal.
A. Pulling power, fuel mileage, economy.
Q. So we are going back to your initial trip to the dealer.
A. Okay.
Q. Tell me more about it.
A. I liked Ron. He was honest, very honest. I can usually read people pretty good. Very cordial. Married. Told me about his family. I liked the guy.
Q. So you just looked at the truck the first time you were there, correct?
A. Right.
Q. And then how did you leave it with Ron when you left the dealership that day?
A. I wanted to sleep on it overnight. I went back the next day and then made a proposal. Was not accepted. He didn't want to give me enough money for my trade-in. Eventually, we came to terms.
Q. And was this the same day?
A. The second day.
Q. I'm sorry, the day that you went back?

Page 22

A. Yes.
Q. You went home and slept on it and the day you went back?
A. Right.
Q. So you came to an agreement the second day you were at the dealership?
A. Yes.
Q. And when you were going back and forth and negotiating on the price, was there any other person that you were dealing with besides Ron Christenson?
A. He had to deal with his sales manager.
Q. And do you know who that person was?
A. I know him if I see him, and I would -- I don't remember his name. He might (indicating).
Q. Did you have direct contact with the sales manager?
A. As far as negotiating, no.
Q. Okay. Outside of the negotiating context, did you have any communication with the sales manager?
A. "Hi, how are you?"
Q. "Thanks for buying the truck"?
A. I hadn't bought it yet.

Page 23

Q. Okay. Anyone else at Western Peterbilt, besides the sales manager and Ron, that you had any communications with?
A. The finance manager.
Q. And do you recall who that was?
A. I'll have to turn this on for a minute. I don't know why I can't remember his name.
MR. BOISSEAU: I think we've told them in the interrogatories.
A. He's the woodworking guy. I'll have it here in a minute. Alan Womack. He's their finance manager at Spokane, Washington.
Q. Was he physically in the dealership?
A. Yes.
Q. Once you reached an agreement on the price of the truck, what happened after that?
A. Then we had to transfer some items off my old truck onto the new truck.
Q. Such as what?
A. There's a light bar right there (indicating), that little light bar.
Q. Wait a second. I'm going to mark this real quick so we know what you're talking about here.
A. These are just some of the items. Not all of

Page 24

them.
Q. It will give me a better idea of what you're talking about. Actually I had the exhibits premarked, so I'm going to refer to Exhibit 4.
A. Okay.
Q. And that's why this 4 is right here (indicating).
A. Yeah.
Q. Can you show me on Exhibit 4 one of the items that you had replaced?
A. This light bar on the sleeper and the light bar on the cab and the light bars on the air cleaner (indicating throughout).
Q. Were there any other items that they transferred from your old truck to the new truck?
A. My locomotive horns. Real ones. Real ones.
Q. Were those horns an original part of your old truck or were they added to the old truck?
A. They were added. Peterbilt does not put locomotive horns on trucks.
THE WITNESS: What are you laughing at?
MR. MURPHY: I'm not laughing. I

just always think it's cool when you hear them.
THE WITNESS: Wakes up the neighbors.
BY MS. DECKER:
Q. And so prior to this purchase, you had not dealt with Western Peterbilt before, correct?
A. No, that is not correct.
Q. That is not correct, okay.
A. I bought -- that '99, I bought from Western Peterbilt in Redding, California. Now I'm not sure if they were Western Peterbilt at that time, but they are now.
Q. Okay.
A. I think -- I don't know how that worked out.
Q. Did Western Peterbilt, the employees at Western Peterbilt, actually do the transfer of the parts from your old truck to your new truck?
A. Yes.
Q. The day that you reached the agreement on the purchase price with Western Peterbilt, did you start the financing options at that time?
A. Yes. With Alan.
Q. And what else happened on that day that you



reached the agreement to purchase the truck?
A. We started transferring items off of it. We had to clean my old truck out. We had to put all of my clothes and computers and all of that stuff in the new truck while they were working on it.
Q. During the process of negotiating the price for the truck, did you at any time talk to anyone from Peterbilt?
A. No. You mean the factory?
Q. Yes.
A. No.
Q. What about PACCAR, did you ever talk to anyone from PACCAR when you were --
A. No.
Q. -- negotiating the deal?
A. No.
Q. I'm going to ask you, prior to purchasing the truck, did you have any communications with Peterbilt?
A. PACCAR you mean? You mean the factory? No.
Q. Peterbilt.
A. No.
Q. Okay. And the same question for PACCAR?
A. No.



Q. Do you understand the relationship between PACCAR and Peterbilt?
A. PACCAR builds train engines.
Q. Okay.
A. And trucks.
Q. So it's your understanding, or you can tell me if I'm wrong, but is it your understanding that Peterbilt is a company of PACCAR?
A. Yes.
Q. Okay.
A. And Kenworth.
Q. What about after you purchased the truck, did you have any communications with Peterbilt?
A. No.
Q. What about PACCAR, after you purchased the truck, did you have any communications with PACCAR?
A. No.
Q. Did you, in your negotiations buying this truck, did you ever discuss what type of warranty might come with the truck?
A. No. Normally, you have a 100,000 mile warranty approximately from one bumper to the other. The engines usually have about 500,000 mile warranty. The rear ends have



750,000 mile warranty with the truck. And I assumed that I got those warranties. Found out later I did not.
Q. When you said you found out later that you did not, what do you mean by that?
A. I was the second owner and it did not transfer to me, because I took it in for some warranty work and that's when I found out.
Q. Okay.
A. And don't ask me what the warranty work was, I can't tell you. I don't remember.
Q. So you took the truck in, how long after you purchased it, for some warranty work?
A. I don't know. I can't remember that.
Q. And do you recall what type of work it would have been?
A. No, no, I can't.
Q. And who told you at that time that the warranty did not extend to you?
A. That would have been a Peterbilt dealership.
Q. Do you remember which one?
A. DSU in Medford.
Q. Do you recall approximately how long after you --
A. No.

Page 29

Q. -- purchased the truck?
At that time did you go back to Western Peterbilt and talk to them about the warranty that you thought you had?
A. I could have bought a warranty for the truck, additional warranty, at the time of the purchase, but it was too late.
Q. And did they tell you at the time you purchased the truck about this additional warranty?
A. No.
Q. So how did you find out that you could have purchased the additional warranty?
A. Through DSU when I approached them before the warranty work.
Q. But at that time they told you it was too late to buy a warranty?
A. Right.
Q. Okay. I've had Vesta mark as Exhibit 1 the sales invoice that your attorney produced to us in this case and I just have a few questions about it. I know it's kind of hard to read. I apologize for that.
MS. DECKER: Do you want a copy of this?

Page 30

MR. BOISSEAU: I'm familiar with it. Go ahead.
BY MS. DECKER:
Q. On the first page of the sales invoice, Ken, it lists Kenneth Ray Smith, and that's you, correct?
A. Correct.
Q. And then Shari -- how do you say the last name?
A. Foeste.
Q. Foeste. And is that your wife?
A. Yes.
Q. Was she your wife at the time?
A. Yes.
Q. And then it has the "LSE" after it. Do you know what that means?
A. The what?
Q. The LSE.
A. Lessee.
Q. Lessee, that's what I thought.
A. It was Ron Christenson. It's right here (indicating).
Q. Your memory is right after these years.
A. Yeah.
Q. Okay. Then at the bottom, is that your

Page 31

signature, Mr. Smith?
A. Yes.
Q. So the purchase price of the vehicle was 114,620?
A. Correct.
Q. The trade-in was the 38,500, is that correct --
A. Right.
Q. -- on your old truck?
A. Right.
Q. And then you would have financed the remaining 76,120?
A. Correct.
Q. On the next page, was this agreement that you had reached with them a lease with the option to buy at the end of the lease or how was that set up?
A. That's correct.
Q. Okay. And the lease was between you and your wife and Western Pacific Leasing?
A. Western Peterbilt.
Q. Okay. And going back, I believe you said that you had looked at another dealer. Was it DSE?
A. DSU.

Page 32

Q. And they didn't allow certain purchases. What did you mean by that? I can't remember what you said.
A. They didn't have the type of owner operator truck I was looking for.
Q. Okay.
A. They had what you call flat top sleepers. You can't stand up in the thing. I'm six-foot tall.
Q. Okay.
A. Besides, I don't like them.
Q. The dealer?
A. Yeah.
Q. And then on page, looks like fax Page 4, there was a warranty provision. Do you see that?
A. I do.
Q. And an actual place that they had you and your wife sign underneath, or initial?
A. Yes.
Q. And that's your initials?
A. Yes.
Q. And your wife's initials?
A. Yes.
Q. Did anyone explain that provision to you at

Page 33

the time?
A. No.
Q. What brought your attention to it to have you sign it?
A. They put the paper in front of me, Alan did. Have you ever bought a car?
Q. Yes, recently.
A. Did you read all your documents?
Q. I did not.
A. Neither did I.
Q. I'm going to hand you Exhibit 2. Ken, I just handed you what we've marked as Exhibit 2, and it's titled Disclaimer of Warranty Agreement.
A. Right.
Q. And again, is that your signature on the bottom of that?
A. Yes, it is.
Q. And do you know who the witness was at the time?
A. No, I can't read it.
Q. It might have been Ron Christenson. I can kind of make an "R" and a "C," but I don't know that. You don't know if it was Ron or not?

Page 34

A. I cannot read it, no.
Q. Okay. Do you recall signing this --
A. No.
Q. -- the disclaimer?
A. No, I don't, but I did. It's my signature.
Q. Okay. And I am going to hand you what I've marked as Exhibit 3. As you can see, that's a Peterbilt Motors Warranty Agreement. Were you ever provided this type of warranty agreement?
A. No, I don't remember this at all.
Q. Okay.
A. But I was right about the warranty.
Q. Do you recall receiving any other documents when you purchased this truck, other than what we've looked at here today, the sales invoice and the purchase agreement?
A. No.
Q. Did you receive anything from Peterbilt at the time?
A. Not that I remember, no.
Q. What about from PACCAR, did you receive anything from them?
A. No.
Q. And I believe in your interrogatory

Page 35

responses -- actually, I'm just going to have Vesta mark these so you don't have to keep guessing what I'm reading from here.
(Deposition Exhibit No. 7 was marked for identification.)
Q. Ken, I'm going to hand you what's been marked as Exhibit No. 7. It's interrogatory responses, and I would like for you just to look over them and then I want to know if you've seen them before.
A. Yeah, I've seen this.
Q. In fact, did you provide some of the information to your attorney?
A. I did.
Q. Okay. I just want to ask you, there's some mention in the interrogatory answers about advertising. Can you tell me what advertising you were referring to?
A. What are we talking about, what page?
Q. For instance, on Page 5, where it starts, "Neither in Peterbilt advertising nor in representations by the dealer." Can you tell me what advertising you're talking about?
A. Any advertising. They've never said a truck

Page 36

will catch on fire. I look at trucking magazines all the time and usually they have a Peterbilt on the front or back of it, normally. No, anything I've ever seen about Peterbilt has never stated that the truck may catch on fire.
Q. And when you say there's either a Peterbilt on the front or on the back, is it an actual Peterbilt advertisement or is it some other entity's advertisement that they've stuck a Peterbilt truck in?
A. No, it's Peterbilts, and it's usually a 379 at that time.
Q. Can you tell me what trucking magazines you read?
A. Oh, man. OOIDA. Oh, shoot. That's the only one I can think of right now.
Q. You said it's a Peterbilt advertisement. Are there any advertisements that are PACCAR advertisements that you've seen?
A. It says Peterbilt as part of PACCAR. Yes, it says PACCAR on it.
Q. And when do you see these advertisements?
A. I get a monthly magazine from OOIDA. And I think they're doing a new model on it. I

Page 37

don't know what it is.
Q. And did you get this magazine at the time you would have purchased this truck?
A. Yes.
Q. And when you purchased this truck, I believe it was in March of 2005; is that correct?
A. Right. March 28th.
Q. Do you remember specifically what the advertisements say?
A. On this truck?
Q. The Peterbilt advertisements, yes.
A. No, this truck -- I didn't look at this truck advertised.
Q. Okay. So you don't know what Peterbilt had represented as far as this truck in an advertisement?
A. They didn't advertise that truck in an advertisement that I know of.
Q. And "that truck" meaning the specific truck?
A. Right.
Q. What about the model of truck?
A. Okay. I don't understand your question.
Q. I think you said it was a 379?
A. Correct.
Q. Had you seen advertisements for 379?

Page 38

A. Oh, yeah.
Q. Prior to your purchase of the truck?
A. Oh, yeah.
Q. And what did those advertisements say, do you recall?
A. It's the class of trucks. You know like buying a Cadillac or a Lincoln, it's the Cadillac of the trucking industry, that type of advertisement. It doesn't use the word Cadillac, but that's what it means.
Q. You don't specifically recall what the particular wording of the advertisement was?
A. Oh, no. No. No way.
Q. Were there any particulars given to you at the time of purchase or prior to the time of purchase from Peterbilt that would have had an advertisement in them, other than your trucking magazine that you said that you saw?
A. No. I've only owned -- I won't own anything but a Peterbilt, so I don't even look. I don't look at their advertisements other than "that's a good looking truck."
Q. And what about any other means of advertisements other than the magazines?
A. No. That's the only thing I've seen.

Page 39

Q. Okay.
A. You'll see a billboard on a highway occasionally.
Q. And at the time you said that you were working for Gordon --
A. Uh-huh.
Q. -- at the time you purchased this truck, correct?
A. Right.
Q. Did Gordon have any interest in this truck?
A. No.
Q. Did any other person drive this particular truck?
A. After I purchased it?
Q. Right.
A. No.
Q. Were you provided an owner's manual at the time of purchase?
A. There's a small one, I believe, was in the glove box. And I did -- yeah, that's what was in there, was in the glove box.
Q. Do you still have that --
A. No.
Q. -- or was it burned in the fire?
A. There was nothing in that truck left.

Page 40

Q. Okay.
A. I was lucky to get my dog out and me.
Q. Did you ever consult the owner's manual that you were provided during the time you owned the truck?
A. Sure. I looked at it.
Q. For what purposes would you have looked at the owner's manual?
A. To read it. Just --
Q. Was there any particular --
A. No particular reason, no.
Q. Okay. Were there like maintenance schedules in there that you --
A. I'm sure there were.
Q. Did you follow the maintenance schedules that were in the owner's manual?
A. No. I was ahead of their schedule.
Q. Okay.
MS. DECKER: Do you want to take a break right now? This might be a good time because I want to talk about the actual incident itself.
(A recess was taken from 10:00 a.m. to 10:10 a.m.)
BY MS. DECKER:

Page 41

Q. Ken, I want to turn now to the incident which brings us here today.
A. Okay.
Q. And I'm just going to kind of start from, you know, the day it happened, and just kind of walk me through what happened that day, okay?
A. Okay.
Q. First of all, I wanted to clarify because there's kind of some inconsistencies in the documents that I've seen. Do you recall what date it was that it happened?
A. September 19th. I believe that's correct.
Q. That makes sense because that would be like a week off, because some of the documents say the day of the loss was the 12th and I thought someone had said it was the 19th, so I'm just trying to clarify it was the 19th and not the 12th?
A. The best I remember, it was the 19th.
Q. Okay. Do you recall what day of the week that was?
A. No.
Q. So start me on September 19th -- of 2007, correct?
A. Right.

Page 42

Q. Tell me about that day.
A. Got up, inspected the truck. Got my pilot car driver going ahead of me.
Q. First of all, I'm going to interrupt you as you're telling me what happened here. Where were you at on September 19th of 2007?
A. That would be -- I think we started in Oklahoma that morning.
Q. So you would have done your inspection before you started out that morning?
A. Oh, yeah. Yes.
Q. What did you inspect, if you recall, that particular morning?
A. The load, the lights, the brakes, the air pressure, oil pressure, checked the engine oil, checked the tires, checked the chains and binders, straps in this case. Was no change in strap -- no change in binders. Straps. Sorry about that.
Q. And what was your load?
A. It was a piece of corrugated building.
Q. Was it an oversize load?
A. Yes.
Q. And where had you picked it up?
A. Houston, Texas.

Page 43

Q. Then you would have stayed in Oklahoma the night you picked it up, the load?
A. Probably did, yeah.
Q. Okay.
A. Yeah.
Q. So after you did your inspection, what did you do after that?
A. We took off.
Q. And it was you and your pilot car?
A. Right. And he was in the front.
Q. I know in the interrogatory responses you indicated that you don't know who the pilot car driver was.
A. I don't know his name.
Q. You don't know his name?
A. No.
Q. Do you know what company he worked for?
A. No.
Q. Is there a particular company that you usually employ for your pilot car?
A. When I have an opportunity, yes, but not in this case.
Q. How did you get hooked up with this particular pilot car, do you recall?
A. Okay. In the trucking business we have what

Page 44

is called an oversized magazine. It has all the rules and regulations in each state that pertain to oversize loads. It also has advertising in it for pilot cars.
Q. And are you the one responsible for getting the pilot car lined up?
A. Yes.
Q. Does the pilot car meet you at the place that you pick up the load and then you go from there with the car?
A. That's correct.
Q. You said that you had picked up this particular load in Houston, Texas, correct?
A. Correct.
Q. Where was it in Houston, do you recall?
A. At one of the terminals. Port Houston, at one of the terminals.
Q. So on the morning of the 19th -- I assume it was in the morning, right?
A. Correct.
Q. Do you recall about what time you left that day?
A. No.
Q. Is there a certain time that you particularly leave?

A. A half hour before sun-up.
Q. Okay. Is there a reason for that?
A. It's state regulation. It depends on the state you're in. Some are sun-up. Some are a half hour after sun-up.
Q. And those are regulations that you cannot drive any sooner than that?
A. Correct.
Q. So after you left that day with your load from Oklahoma, tell me what happened after that.
A. We were on State Route 75. Got into Kansas and crossed at Beto Junction. I believe that's I-35. You know, it was pretty uneventful. It was a nice day.
Q. Was it windy?
A. No.
Q. So you crossed Beto Junction approximately what time, do you recall?
A. No.
Q. Okay.
A. After noon.
Q. Okay. Tell me what happened after that.
A. Shortly after crossing I-35 there at the Beto Junction, I began to smell diesel and it was



pretty strong so I looked at the asphalt in front of me, the pavement.
Q. As you're driving?
A. As I'm driving.
Q. Okay.
A. To see if there's any spillage on the road. I don't see any.
Q. Okay. I'm just asking this question real quick. You said you looked in front of you as you're driving?
A. Correct.
Q. How would there have been diesel in front of you as you're driving?
A. There might be another truck in front of me that had spilled some.
Q. So you didn't necessarily think it was coming from your truck at the time?
A. I was hoping it wasn't.
Q. Okay. I interrupted you. I'm sorry. After you smelled diesel, what happened?
A. You derailed me.
Q. I didn't mean to do that.
A. Then I look at my fuel pressure gauge, and it is digital, and it's going through the whole spectrum of pressure. Normally it runs about



88 pounds of fuel pressure, between 85 and 90. It will vary a little bit. Well, it was going the full spectrum, so I knew I had a problem. So I yelled at my pilot car driver.
Q. You mean you yelled at him on the --
A. CB radio. The law requires we have CB's to communicate. I yelled at him on the CB radio, asked him to find me a wide spot because I had a major problem. There was a little rest area a quarter mile, half mile up the road. He told me where it was. It was on a left-turn entrance and it was an S-turn in the rest area.
Q. Okay.
A. And I pulled in there, and I was still rolling, and set my brakes, which I never do, ever.
Q. Why?
A. Because it's hard on your equipment.
Q. Okay.
A. You can break something if the vehicle's still moving. I won't set my brakes even at one mile an hour. I won't do it.
Q. Okay.
A. I set the brakes. The truck come to a stop.



I grabbed my dog. I stepped out of the truck because it was filling full of smoke, I believed was smoke at that time.
Q. Okay. Was it like dark smoke, gray, black; what color?
A. Gray.
Q. Okay. Other than your fuel gauge going crazy, was there anything else, you know, on your dash lights --
A. No.
Q. -- doing anything? It was just the fuel gauge?
A. Just the fuel gauge.
Q. The rest stop that you came to, was it along I-35 or was it along Highway 75?
A. 75.
Q. Okay. So the truck is filling with gray smoke, correct?
A. Uh-huh.
Q. And you still smell diesel at this time?
A. Oh, yeah, very strong.
Q. Do you see any flames inside the cab?
A. No.
Q. Smoke only in the cab?
A. Smoke only.

Page 49

Q. Okay. So then once you and your dog get out of the cab, what happened after that?
A. I started walking backwards looking at the truck, and I yelled at my pilot car to dial 911 because I thought the truck was on fire. I didn't see any fire.
Q. Okay.
A. But about 20 seconds after I got out of the truck, the truck ignited under the left side of the engine with blue and orange flames.
Q. You said it was under the engine?
A. Left side of the engine, the driver's side.
Q. Blue and yellow flames?
MR. BOISSEAU: I think he said blue and orange.
A. Blue and orange.
Q. Okay. Sorry. You said that was approximately 20 seconds after you got out of the cab?
A. Right.
Q. Where were you standing at the time?
A. About 20 feet in front of it, maybe 30.
Q. Where was the pilot car driver at the time?
A. He was in front of the truck. I don't know how far. I yelled at him to dial 911, and he

Page 50

had already done so.
Q. How did you extinguish the fire?
A. I didn't. The fire department did.
Q. Okay. So there was a fire department on scene?
A. Later.
Q. Do you recall how long it took them to respond?
A. Very few minutes.
Q. Okay.
A. There was a -- yeah, very few minutes.
Q. Did just one truck respond or how many fire trucks were there?
A. Two fire trucks and I believe the deputy sheriff. I know for a fact the deputy sheriff.
Q. Was that all who responded to the fire then?
A. A couple more cops.
Q. How long did it take them to extinguish the fire?
A. Ten minutes.
Q. Did they have to use multiple hoses or were they able to just get it with one?
A. I think they used two, if I remember right.
Q. Do you know if any of the responders prepared

Page 51

a report?
A. I have no idea.
Q. Did any of the responders get a statement from you?
A. The deputy sheriff.
Q. And what did he ask you at the time?
A. He wanted to see my registration.
THE WITNESS: Oh, she gets tickled.
A. My logbook and my driver's license.
Q. Okay.
A. I told him to look at anything he wanted to, just go to the truck, they were in there. Would you like the man's name? I know I'm not supposed to volunteer.
Q. No, that's okay. That was going to be my next question.
A. John Knapp, Deputy.
Q. He gave you a card?
A. Yes, he did.
Q. Do you know the names of any of the other responders?
A. No. Only the tow truck.
Q. So I'm assuming that Deputy Knapp just asked you to give your version of what had

Page 52

happened, or did --
A. No, he didn't even ask me that.
Q. He didn't?
A. No, huh-uh. He just wanted to see the registration, my license and the logbook.
Q. Okay. Did he ask you any other questions besides those?
A. Not really. Not that I can think of. It's been a long time.
Q. Yeah. Prior to the fire that day, had you noticed anything unusual about your truck?
A. No.
Q. When was the last time you had fuelled it, filled it up?
A. Oh, man, I can't answer that. It would have been that morning or the day before. It's usually every other day.
Q. Okay. But you don't specifically recall on this particular occasion?
A. No, I do not.
Q. And this happened just after you had crossed the Beto Junction --
A. Yeah, a couple miles.
Q. -- 135 area?
A. A couple miles or so.

Q. What direction were you traveling at the time?
A. North.
Q. When you say that it was a part of a building that you were transporting at the time --
A. I think it was a silo, part of a silo.
Q. Okay. Part of a silo?
A. Uh-huh, if I remember right.
Q. Do you have any idea or recall the dimensions of it?
A. Yes. 15 feet wide, about 20 feet long, and about 13 feet high. I remember the 15 for sure.
Q. You have a pretty good memory.
A. This was a major incident. That's why I remember it.
Q. Do you recall how much it would have weighed?
A. It was light.
Q. Okay.
A. It was not heavy.
Q. And what does light mean to you?
A. Under 80,000 pounds.
Q. It's all relative.
A. Yes.
Q. I don't know if you told me this before,



where were you headed with the silo?
A. Nebraska.
Q. It's my understanding that the load was not damaged, correct?
A. The load nor the trailer, neither one.
Q. And at the time you noticed the fuel gauge starting to go from high to low, or whatever it was doing at the time, were you on a flat surface? Were you going uphill, downhill, can you tell me?
A. Flat.
Q. Had you ever on a prior occasion noticed the fuel gauge fluctuating like that?
A. No.
Q. Do you recall how long you would have been driving that morning from the time you started until the time this happened?
A. No. Probably, what, six hours maybe.
Q. Okay.
A. That was not straight through six hours. We take a break in between to check the truck, check the load. From start to finish --
Q. Do you recall --
A. Every three hours I usually stop and check the load.



Q. And where do you usually stop, just at a rest stop?
A. Anyplace I can. Anyplace I can get off the road that's safe.
Q. Other than checking the load that day, would you have checked anything else with the truck itself, the engine oil?
A. No. No. You walk around, check the load, check the tires, check the lights, make sure everything is still working right. But to stop the engine, check the oil, no.
Q. But to your best recollection, you had checked the oil and did all your other inspections that morning before you left?
A. Every morning. It's a habit.
Q. So you actually open the hood of the truck --
A. Yes.
Q. -- before you leave?
A. Right. Before you start it.
Q. And you didn't notice anything wrong that morning?
A. Nope.
Q. Approximately how long had the fuel gauge fluctuated like you said it was fluctuating before you noticed the smoke coming into the



cab?
A. Immediately when I looked -- I look at the asphalt. I don't see any spillage. Then I look at the fuel gauge and it's going crazy.
Q. Okay. And then at that time the smoke started to fill the cab, or was it after that?
A. After that. When I started slowing down where the wind was not blowing, then it started coming in the cab.
Q. And was it coming into the cab before you were able to get off to the rest stop or was it at the rest stop?
A. As I was getting off at the rest stop.
Q. Okay.
A. Rest area is what it actually was called.
Q. And at this time I believe I saw somewhere in the documents the truck would have had over 300,000 miles on it, correct?
A. It could have, yes. I would have to look at my records.
Q. You would have owned it for about two and a half years by that time, right, if you purchased it in March of 2005 and this happened in September of 2007?

A. March, April, May, June, July, August, September. Yeah, two and a half.
Q. Two and a half years. When you purchased the truck you had mentioned they transferred some things from the old truck to your new truck?
A. Uh-huh.
Q. Did you add any other aftermarket items to the truck after you purchased it? I know you mentioned you had a CB. Does the CB come with the truck?
A. No, it does not.
Q. Okay. What are some other things that you would have added to the truck after you purchased it?
A. Lots of stuff.
Q. Okay.
A. Here's your little --
Q. We're going back to Deposition Exhibit No. 4.
A. You see this fender (indicating)?
Q. Yes.
A. It's a stainless steel fender. I put those on.
Q. On the back wheels of the truck you put a stainless steel fender?
A. On the front of the front drive axle.



Q. Okay.
A. On the axle itself, right here (indicating) is what -- it's a little hub cab with a knock-off hub cab on it. Then there's ten lug nut covers with little red reflectors on it on each of these wheels. There's a hub cab on this axle (indicating) I put on. These rock guards I put on.
Q. The axle is the front --
A. Front axle.
Q. Front right --
A. Left and right -- right and left. The sun visor is aftermarket. The stacks are six inches. Those are aftermarket. The light on top is aftermarket. These lights on the side are aftermarket. There's a lot of things I put on that truck. There's about $40,000 more after I purchased the truck.
Q. Okay. And who would have put the aftermarket items on the truck?
A. Depends on where I was.
Q. Okay.
A. Harvey Lopez, Harveys Shop put the fenders on. Who put that sun visor? Redding Peterbilt put the sun visor on for me because



they shipped it down from Spokane. The rock guards, Harvey probably put those on. There's a lot of things on that truck. The dash was all LED gauges. It was not Peterbilt's gauges. The only Peterbilt gauge in that truck was the speedometer and the tachometer.
Q. Okay. And whose gauges were they?
A. Teltek, Sparks, Nevada.
Q. And who put those in?
A. Harvey.
Q. And when were those installed?
A. I don't have a date.
Q. Do you recall, would it have been in 2007 or would it have been closer to the time you purchased the truck?
A. Closer to the time I bought the truck. I didn't do them all at once. They cost 180 each, so I did them a little bit at a time.
Q. Tell me again, what were the only gauges that were Peterbilt?
A. Speedometer and tachometer. Those were not changed.
Q. So the fuel gauge was not a Peterbilt fuel gauge?



A. No, it was not. They're inaccurate. They're not precise.
Q. Okay. What makes you say that?
A. Because they're not Stewart Warner gauges, which Pete used to put in their trucks, which were very accurate. I don't know who they're using now. They were not accurate gauges. The gauges I have in my '05 -- or, excuse me, '04, are not accurate.
Q. So did you purchase the gauges from Teltek?
A. Yes.
Q. You purchased them directly from Teltek?
A. Yes.
Q. And then you had Harveys install them?
A. Correct. Each gauge has a box with instructions on how to install them.
Q. Okay. Would you still have the invoices for the gauges?
A. In the truck.
Q. Okay. That would have been stuff that you carried with the truck itself?
A. Yeah.
Q. Okay. So what maintenance, repairs, would you have had before the date of the incident on the driver's side of the engine

compartment, do you recall?
A. Nothing under the hood. I did replace the radiator.
Q. And why did you replace the radiator?
A. Because it was a three core and I needed a five core. Better cooling capacity.
Q. And that had been replaced shortly before this happened?
A. Yeah, 3,000 miles before. That was like one of the first trips with that.
Q. Was it the first trip after you had it replaced?
A. No. One of the first trips. It wasn't -- I believe it was about 3,000 miles.
Q. Okay. After you had the radiator replaced, which I think the records show that was like September 8th of 2007, was there any other maintenance or repairs that you had from that time --
A. No.
Q. -- until the date of the incident?
A. Not that I remember.
Q. Do you recall when the last time the fuel filter would have been changed?
A. The last time I changed the oil.



Q. And when was the last time you changed the oil?
A. I would have to look that up. I do that at every 12,000 miles. Peter -- Caterpillar recommends 15.
Q. Do you still have records that would show that, when you changed the oil?
A. You've got them here.
Q. Okay. So the repair records would show that?
A. It should be here.
MR. BOISSEAU: It's primarily Harveys, isn't it?
THE WITNESS: He changed the oil sometimes --
MR. BOISSEAU: Okay.
THE WITNESS: -- but not all the time.
Q. So everytime you had the oil changed, you had the fuel filters changed, too?
A. Every time. You do fuel, you do water -- no you don't do water, not -- no. You do fuel. I think there's two oil filters. Yeah, two oil filters.
Q. You said the lights that were added to the fenders, do you believe that Harvey did that,



or do you recall who did that?
A. Western Peterbilt.
Q. Because those were the ones that you had transferred over?
A. Right.
Q. Prior to the date of this fire, you hadn't had any other fires with this truck, had you?
A. I never had a fire with any truck.
Q. And you've always owned Peterbilt trucks?
A. Only Peterbilts.
Q. Why only Peterbilts?
A. It's class.
Q. Okay.
A. The major reason -- there's a couple: The resell value is much greater, and it looks like a truck should look.
Q. After this incident, I'm assuming that you got a replacement truck, correct?
A. Yes, I did.
Q. And what did you get to replace this one?
A. It's setting [sic] outside. You saw it.
Q. I guess I wasn't paying attention. It's a Peterbilt I'm assuming?
A. It's a 379 Peterbilt, yes. It's an '04. It's a year older than this truck was.



Q. And where did you purchase it?
A. Doonan Peterbilt, Wichita, Kansas.
Q. What made you choose Doonan in Wichita, Kansas?
A. Because Brad was a very good salesman.
Q. Brad? I'm sorry, who's Brad again?
A. Brad is a salesman.
Q. At Doonan?
A. At Doonan.
Q. Okay. I'm sorry I interrupted you. Go ahead.
A. Okay. After the fire, I got a room. I believe it was at the Wyatt Earp in Beto Junction, and it's right next to a TA Truck Stop, so I went and picked up what's called a truck paper which advertises trucks. I spotted this truck. I was looking for what the replacement value of my truck would be because I had no clue, and I spotted this '04 in the paper. I called Brad the following morning, a couple days had probably passed, and he volunteered to come and pick me up, because I had no driver's license, no money. I couldn't rent a car. Couldn't ride a bus, nothing. I was stuck. But he came and

Page 65

picked me up and showed me the truck, so I purchased this one.
Q. Okay. Is that truck that you purchased here in Wichita, is that how you were able to make it back home?
A. Yes.
Q. Okay. Back to the day of the incident, after the truck fire was put out, what happened after that?
A. The tow truck driver showed up and he told me explicitly he knew that we should tow it back to his shop, which was at Beto, and then he had a second truck come in and pick up the trailer and bring it back. Then I called ATS Sureway, the broker on the load. They sent another tractor, picked up my trailer, went and delivered the load.
Q. So the tow driver was from Beto Junction?
A. Yes.
Q. And he towed the truck from the rest area to his place of business?
A. To his yard, yes. He owns the business. His name is Robert.
Q. And that was right at Beto Junction?
A. Yes.

Page 66

Q.. And he towed the same day of the fire?
A. Yes, the same afternoon. As a matter of fact, we barely got in before dark.
Q. But you did get the truck to the --
A. The tow yard.
Q. -- the tow yard --
A. Yes.
Q. -- before dark?
A. Yes.
Q. Do you know about how long it was between the time the fire started and by the time the truck ended up in the tow yard?
A. No. No. A couple of hours probably. Seemed like forever.
Q. So Harveys Truck Repair was the last repair shop that would have done any repairs on the truck prior to the fire?
A. The radiator, yes.
Q. Do you know what happened to the truck once it got to the initial tow yard, what happened to the truck after that?
A. The insurance adjuster came over and looked at it several days later; in fact the same day that I went to Wichita to look at this truck.

Page 67

Q. And that would have been the next day?
A. I think it was two days.
Q. Okay. So you were in the Wyatt Earp Hotel for two days?
A. I believe that's the name of it, yeah.
Q. Okay.
A. I was -- yeah, a couple of days.
Q. So were you there when the insurance adjuster was there?
A. No.
Q. Do you know who the adjuster was?
A. His name's Fred.
Q. Do you know if anyone else besides Fred from the insurance company looked at it?
A. No. He's the only one I know of.
Q. Were you in contact with Fred?
A. Yes.
Q. And what was your contact with Fred?
A. He was going to determine how much -- what the value of the truck was. I had it insured for 100,000, and he came pretty close to it.
Q. Was he able to tell you that when he was at the tow yard or later?
A. Later.
Q. So he just went to inspect it?

Page 68

A. Inspect it, determine what caused the fire or anything.
Q. Was he able to tell you what he thought caused it?
A. No.
Q. Did you have a suspicion on what might have caused it?
THE WITNESS: How do I answer that?
MR. BOISSEAU: I don't know. I guess she wants to know if you have a suspicion. Tell her if you have a suspicion.
A. Yep, I do.
Q. What do you believe caused the truck fire?
A. They put the fuel line -- Peterbilt, when they assembled the truck, put the fuel line in a wire loom with all this other gobbled wires together, and I believe the fuel line would have chafed, you know. Do you understand chafing?
Q. Explain it to me.
A. It's when two pieces are together like this (indicating) and they move opposite of each other and they wear. That's chafing.
Q. Okay.

Page 69

A. And one of them is eventually going to wear a hole in the other. So I imagined, suspect that the fuel line wore a hole in it, and that burst the fuel line, let the fuel escape. And being in that loom, which is underneath the ECM, is very hot. The engine is hot. Obviously something got the fuel hot enough to ignite it. But with these lines chafing each other, that's what I suspect it was; it developed a hole in the fuel line because of putting it in the loom with all the other wires.
Q. What's the basis of your opinion of what might have happened?
A. That's the only thing I can think of that would happen. It would be -- when you pull into an inspection for the weigh station at the police departments, they will go look at all your hoses, see if they're rubbing anything, and they call that chafing. And this is the same thing. That's the only thing that I could possibly -- that I would think of. Not an expert. I haven't been to school for this. But your two lines -- when you have anything chafing like that, one of

Page 70

them's eventually going to wear a hole in it of some kind.
Q. Are those lines that you're talking about, are those lines that are visible when you lift up the hood?
A. No. They have, oh, I don't know, a piece of rubber or something around the lines usually that are zip-tied to keep them all together.
Q. So you wouldn't see them --
A. No.
Q. -- when you were doing your daily inspection?
A. No, you would not.
Q. Would you see them when you're changing out the fuel filters?
A. No. They're between the frame rail and the engine block above the starter and below the ECM. It's something that was not visible.
Q. After you initially talked to Fred, he was getting you the value figures for the truck, did you have any other contacts with Fred?
A. No, that was -- you mean later?
Q. Right, later.
A. Yeah.
Q. What other contacts did you have with Fred?
A. I asked him if I could have my train horns

Page 71

back.
Q. Did he let you?
A. Not yet.
Q. Oh, you still don't have them?
A. No, I don't.
Q. Okay. Anything else?
A. No, not -- oh, I asked him for the pictures, if he had pictures of the truck, and he said yes, so he sent them to me. He e-mailed them to me.
Q. Okay.
A. But that was not very long ago. And Eldon didn't even know I had them.

MR. BOISSEAU: You're supposed to tell your lawyer.

THE WITNESS: I didn't think it was important.

MR. BOISSEAU: You're supposed to tell your lawyer.
A. He was so surprised yesterday when I told him I had them. It was funny.
Q. We have the invoices for the maintenance and the repairs that were done on the truck. Did you keep any other type of log on repairs and maintenance?

Page 72

A. I have -- I should have brought it with me. I have an envelope that I developed that's -- you can put a binder like that (indicating). Every time I fuel, I write it down on this envelope how many gallons, how many miles, how much I paid for the fuel.

MR. BOISSEAU: She's asking you whether you got it for the truck in question, not what you do today. I mean if you have it, why tell her.
Q. Right.
A. Yeah, I probably do.
Q. You probably do still have them?
A. Yeah.
Q. It wouldn't have been in the truck at the time?
A. You're right. It was in the truck. It's -- there's a door pouch right here (indicating). It would have burnt up. You're right. For that month, yes, it would.
Q. For just that month. So you might have --
A. Just for that month.
Q. You might have other records?
A. Prior, yes. It's -- usually all it is is fuel receipts. When I change the oil and

Page 73

when I cross the state lines, I have to record those. So it's just fuel and that type stuff.
Q. Oil changes you said?
A. Not really. Not on that envelope, no. Occasionally I write them on there, but not as a habit.
Q. What about any other type of maintenance records?
A. No. I would have maybe a pilot car receipt that I would put on there, something of that nature, but, no, not -- not maintenance, no. It's primarily just when I fuel and cross state lines is what that envelope is for.
Q. You mentioned that you weren't an expert on the cause of the accident?
A. Right.
Q. Going back to your background, what type of education do you have?
A. Grammar school, high school, auto mechanics.
Q. What's the extent of your auto mechanics training?
A. Two hours a day four years in school, high school.
Q. Did you have anything beyond high school,

Page 74

education beyond high school?
A. No.
Q. Did you have to take any trucking courses?
A. No, we didn't -- we didn't have schools when I started. School of hard knocks.
Q. Have you had any training, formal training, on maintaining trucks?
A. Only from the people I worked for. I have helped build engines, transmissions, rear ends, brakes. The brake shoes on the truck, I can take them apart, put them back together with new shoes. Tires, batteries. I'm pretty good at -- if you break an air hose, it's hard to repair it on the road, but you can. You take some rubbing alcohol, clean it really, really good, take some duct tape, wrap around it, take some baling wire, wrap around that, you can go down the road until you can get it fixed.
Q. Okay.
A. Things like that. Basic knowledge, yes, I can keep myself going pretty good. But no schooling, no.
Q. Since the fire incident, have you had any contacts, communications with Peterbilt?

Page 75

A. Nope. Only to buy another truck.
Q. And what about PACCAR --
A. No.
Q. -- any communications?
There were a lot of repair records that your attorney provided to us, repair, maintenance records.
A. Right.
Q. And I've just kind of picked out a few that were kind in the same year that this accident occurred, and I was just going to kind of go over a few of them with you, and if you can kind of tell me what was going on with the truck at the time, that would be helpful.
A. Okay.
Q. So I'm going to go ahead and stop real quick and have Vesta mark these so it will go a little quicker.
(Deposition Exhibit Nos. 8 through 15 were marked for identification.)
Q. All right. So let's start with the first one that Vesta has marked Exhibit No. 8.
A. Uh-huh.
Q. You've had a chance to look at it. Can you tell me, this was from Western Peterbilt in

Page 76

Tacoma?
A. Correct.
Q. Can you tell me what this particular repair invoice is for?
A. It's in the trailer.
Q. Okay. This is the trailer?
A. It's the trailer.
Q. This doesn't relate to the truck itself?
A. Nope.
Q. What was being done to the trailer at the time?
A. There was -- on the -- the lights were tripping the circuit breaker because there was a short and we had to find it. And we found it in the back deck, which he had to remove one of the wooden panels to get to the shortage.
Q. The wooden panels on what, on the truck itself --
A. Wooden deck.
Q. -- or on the trailer?
A. Wooden deck. This has nothing to do with the tractor at all. Trailer only.
Q. All right. Then we can move on to Exhibit 9. And this is an invoice from Cashman, Cash

Truck Shop.
A. I have Peterson CAT here.
Q. Did I give you the wrong one? Let's look at 10.
A. Cashman.
Q. Exhibit 10?
A. Oh, yeah, it is Cashman.
Q. From Cash Truck Shop?
A. Yeah. The radiator's overheating.
Q. And this was back in June?
A. This is why I replaced the radiator.
Q. So in June of 2007 the radiator was overheating?
A. Uh-huh.
Q. Okay. But you didn't have it replaced at this time --
A. No.
Q. -- not in June?
A. No.
Q. What did you have done in June then?
A. It was cleaned.
Q. And this Cash Truck Shop is the one that cleaned the radiator at that time?
A. Yes, they did.
Q. Did they do anything else, other than clean



the radiator?
A. No, that's it. They just cleaned it.
Q. Why was it overheating, did they tell you at the time?
A. Because the radiator was dirty, bugs, et cetera.
Q. What is Exhibit --
A. 9.
Q. 9 is the one that I didn't --
A. You skipped it.
Q. That was Peterson, right?
A. Right.
Q. Can I see it real quick? We'll match up mine.
Okay. Tell me what Exhibit 9 is.
A. The fan is staying on. Could find nothing wrong. Flashed to latest software and rechecked fan. Still couldn't find nothing wrong. Installed inlet temperature sensor at the customer's request.
Q. So at that time, what was your concern about the truck that they were trying to deal with?
A. The fan would not shut off.
Q. The fan to what?
A. Behind the radiator to keep the engine cool.



Q. What's the date of that invoice, can you tell on that one?
A. May 18th.
Q. Is that May 18th of 2007?
A. Yes.
Q. I'm going to hand you Exhibit 11. If you can tell me what the issue was that they were addressing on that particular invoice.
A. Same thing.
Q. That's the Peterson?
A. Right. It's the same thing.
Q. What's the date of that invoice?
A. I don't see it.
Q. You're right, I don't see it either. But it's the same radiator issue that they're addressing on that invoice?
A. It looks like it. Troubleshoot fan assembly.
Q. Okay. I'm going to hand you Exhibit 12. If you can tell me what that repair work's for.
A. They replaced the thermostats. This is in Vegas the same time they cleaned the fan. They put new thermostats in. The same time they cleaned the radiator, I'm sorry.
Q. So they cleaned the radiator and replaced the thermostats?



A. Two thermostats.
Q. What were the thermostats to?
A. That controls the temperature of the water, helps control it.
Q. I'll hand you Exhibit No. 13, if you can tell me what that repair was for.
A. The fan did not shut off, and this is in Jacksonville, Florida.
Q. This was in August of 2007?
A. Yeah. Oh, this is in Tucson, okay. Rush Peterbilt. Yeah, it was. They didn't find the problem either, but we eventually did find it.
Q. And what was the problem when you took it in? What did you tell them the problem --
A. The fan would not shut off.
Q. Was this causing an overheating situation?
A. No. Actually it would be cooling.
Q. Okay. Is that the fan to the radiator?
A. Yes.
Q. Did they do anything to help the problem?
A. Nope.
Q. Okay.
A. Unqualified mechanic, thought he was qualified.

Q. Did he try? I mean did he make any attempt --
A. Yes.
Q. -- to fix it?
A. He tried. He couldn't find out what was wrong with it.
Q. Earlier when you were talking about having replaced all the gauges --
A. Uh-huh.
Q. -- I did not see, I don't think, in the documents that we've been provided any documentation of those gauges having been replaced. Is that something you would have in your documents?
A. What do you mean docu -- no. You asked --
Q. The documents related to this particular truck.
A. You asked me if I had receipts for them. I told you they were in the truck.
Q. But you don't have any like invoices from Harveys or whoever that installed them?
A. No, I don't. Not that -- they should be in here (indicating).
Q. If you have them?
A. Yes.



Q. I'll hand you what's been marked as Exhibit 14. If you can tell me what that particular repair was.
A. This is how we fixed the fan. The fan assembly was defective so they -- this is how it was fixed. I think that's what it is.
Q. What do you mean by "the fan assembly was defective"? Did they tell you --
A. The big round hub that goes directly to the engine that's bolted to the engine, and if that hub -- it has a clutch in it, and at certain temperatures the clutch will engage, like your clutch on a car, stick shift, and make the fan go around. If it is not operating properly, the clutch will not disengage, or it will not engage, depends on what's going on. In this case, the clutch was always engaged, so that's why the fan wouldn't shut off. Finally, we found that there was of a bad bearing in there, I believe it was a bearing. And we just replaced the fan assembly with these parts, which was not cheap, $1100 worth.
Q. That was done in Arizona?
A. Tucson, Arizona, yeah. That's what it looks



like.
Q. On the 25th of August, 2007?
A. Yeah, that's what it looks like.
Q. It also references a breaker circuit.
A. Circuit breaker?
Q. Yeah.
A. 25-amp, yeah.
Q. What was that for?
A. That might be the override switch.
Q. But it was related to the radiator fix that they were doing?
A. Fan.
Q. Fan, okay.
A. That, I don't know, I can't answer that, because I replaced that for some reason.
Q. Okay. Then Exhibit 15, I believe that's the last repair from Harveys Truck Repair?
A. Yeah. That's my radiator core. I went from copper to aluminum for better cooling. Went from a three core to a five core.
Q. So from August 25th of 2007 when you had the repair in Tucson, whatever repair they did in Tucson did not fix your problem, is that a fair statement, or did it fix it and you just wanted a bigger system?



A. It helped, but it didn't cure what I wanted. I wanted the engine to run cooler.
Q. Again, you're not aware of any other repairs that were performed on the truck after this September 8th, 2007, correct?
A. Not that I can remember.
Q. Do you recall whether you had a load with the truck from the time it was repaired to the time of this load that --
A. Oh, yeah.
Q. -- resulted in a fire?
A. Sure.
Q. What would it have been, do you recall --
A. No way.
Q. -- the load?
A. No.
Q. You don't recall what it was?
A. No, I have no idea. I know I took it to Texas, whatever it was. The only reason I remember this load is because of the incident. That's the only reason.
Q. In your logbooks in the truck?
A. Yes.
Q. What period of time would those logbooks that burned would they have covered?

Page 85

A. From the first day of September until the truck caught on fire the 19th.
Q. The monthly logbook that you keep?
A. Yes.
Q. Do you keep your other logbooks?
A. What other logbooks?
Q. From other months?
A. Yes.
Q. Okay. How long do you keep the logbooks?
A. Usually three years.
Q. Do you still have your logbooks from 2007?
A. I might.
Q. What kind of information do you put in your logbooks other than --
A. My daily trip. That's it.
Q. Just the time you're on the road?
A. That's it.
Q. I'm going to show you what's been marked as Exhibit 5, which appears to be the truck after the fire.
A. Yes, it is.
Q. Okay. And can you tell me what area of the truck you saw the flames coming from? Actually, I might have you just circle or highlight.

Page 86

A. In would be from the bottom.
MR. MURPHY: Is there a page number at the bottom you're looking at?
THE WITNESS: Pardon me?
MS. DECKER: Yes. It's 168.
MR. MURPHY: Thank you.
MS. DECKER: Yes.
A. (Witness complies.) Right in there.
Q. That's the area where you saw the flames from?
A. Yeah.
Q. How big were the flames? I mean, were they shooting up to the top of the truck? Were they contained?
A. Not yet. It exploded like -- you know, it's a fire. If you've ever seen a fire, it exploded and then it started burning. Diesel -- it doesn't matter. Anyway, when the flames started going through the hood, then I knew I was screwed. I knew that truck was gone. There was nothing I could do about it.
Q. And Exhibit 6, again another picture of the truck --
A. Uh-huh.

Page 87

Q. -- after the fire. And this is the passenger side, correct?
A. Correct.
Q. And there wasn't any damage on the outside, other than the paint damage --
A. Right.
Q. -- to the passenger side, correct?
A. Right.
Q. In your answers to interrogatories, when you were describing the incident, you referenced that the fire was underneath the left side of the engine and around the starter area.
A. Correct.
Q. Can you show me, where you circled on Exhibit 5, where the starter area would have been.
A. Right in here (indicating).
Q. Okay. Can you mark that with a blue pen.
A. The start -- see, this is the frame rail here. The starter is down below, so it's down in this area here somewhere (indicating).
Q. Okay. That's not going to show up very well.
A. It's up against the firewall, under the firewall.

Page 88

Q. Can you go ahead and try to highlight the circle that you drew? The blue is not showing up very good. I think it was right there (indicating).
A. I'm not an artist, but I think it's in approximately that area there (indicating).
Q. Okay. Which is shown by the highlighted circle within the larger circle --
A. Right.
Q. -- where the flames were?
Is it your contention that Peterbilt knew about other engines catching on fire like this?
A. Yes.
Q. And what's the basis of your contention?
THE WITNESS: Time for a break?
Q. You can't take a break when there's a question pending.
MR. BOISSEAU: No, you've got to answer her question.
THE WITNESS: Okay.
A. The tow truck driver, Robert, when he showed up, he told me, "I know exactly what happened because I've repaired these before. They've caught on fire." That's when he described to

Page 89

me what happened, and it's a continuing problem with PACCAR, Peterbilt. He's still replacing these fuel lines. And I've talked to other mechanics at Peterbilt dealerships and they won't discuss it because they know they have a problem. Peterbilt knows they have a problem.
Q. But yet you bought another Peterbilt truck?
A. I did. And the first thing I did was replace that fuel line before it ever left the shop.
Q. Robert was the tow truck driver from Beto --
A. Lebo Towing.
Q. Lebo Towing?
A. At Beto Junction. He's the truck driver and owner and mechanic. He's been doing this a lot of years.
Q. Okay. Let's go back to the interrogatory answers. I'll have you take a look at those. Specifically on your answer to No. 17 where he's asking about your damages and you've provided a list of things. It's my understanding that the insurance company paid for the value of the truck, correct?
A. The insurance company did, yes.
Q. Okay. So these items are out of packet

Page 90

things that you had to pay for as a result of the fire; is that correct?
A. Part of them.
Q. When you say part of them, what do you mean?
A. Well, there's a lot more here that I didn't list. Yes, all of these I had to pay for out of my pocket.
Q. And they were all things that you had in the truck at the time?
A. Yes.
Q. And you don't have receipts for all of them, it's my understanding?
A. No. No, I don't.
MS. DECKER: I think that's all the questions I have for now.
MR. BOISSEAU: Mr. Murphy gets to ask you questions.
THE WITNESS: Mr. Murphy.
CROSS-EXAMINATION
BY MR. MURPHY:
Q. Mr. Smith, I'm not sure I can break the habit and call you by your first name --
A. That's fine.
Q. -- but I'll try, Ken.
A. Okay. Good.

Page 91

Q. We were just looking at the interrogatories in Exhibit 7, and those were submitted by PACCAR and Peterbilt. Do you understand that?
A. No.
Q. Okay. Well, if you'll look at Exhibit 7, those are written questions that the other two defendants -- and I guess I might add I represent Western Peterbilt. Do you understand that?
A. Yes.
Q. All right. If you look at Page 2, Paragraph 4, up at the top, it defines the term "Defendants" --
A. Right.
Q. -- and it lists PACCAR and Peterbilt. So for the purpose of these questions and answers, I guess it's kind of limited to PACCAR and Peterbilt, but I also want to ask you some similar questions and see how your answers relate to my client, Western Peterbilt --
A. Okay.
Q. -- okay? You had a chance to look through these interrogatories. Are there any questions or answers that apply to the other

Page 92

two defendants but don't apply to my client, Western Peterbilt?
A. Like what?
Q. That's okay. If you don't know anything off the top of your head --
A. No.
Q. -- I will ask specifically.
A. Okay.
Q. If you would look at Interrogatory No. 4 on Page 4, this was a question that says, "Please state all facts in support of your Washington Consumer Protection Act claim."
A. Okay.
Q. If you can read through your answer and tell me, do you know any other facts in support of your claim against my client, other than what you wrote here?
A. No. The -- "Dan" is "Ron." You got that wrong.
MR. BOISSEAU: What he's talking about is we said "Dan" --
THE WITNESS: Salesman's name.
MR. BOISSEAU: -- salesman's name but it's Ron. And we've come up with his last name here today.

Page 93

MR. MURPHY: Sure.
THE WITNESS: Yeah, Ron Christenson.
BY MR. MURPHY:
Q. Otherwise, that answer applies to my client as well, too?
A. Right. Looks pretty accurate, yeah.
Q. On Interrogatory No. 5 at the bottom of that page you were asked about "representation and/or misrepresentation by Defendants," and you gave an answer. Is there anything, other than what you wrote here, that you contend my client represented or misrepresented to you?
A. No. He represented it as a good truck.
Q. Let's talk about that then. Can you tell me anything else that was said by Ron or anybody else at Western Peterbilt about this truck or your purchase of it?
A. In what manner? What are you referring to?
Q. Well, you've alleged representations or misrepresentations, and I'm just curious to find out, because this is the only chance I have to talk to you, what representations you received from Western Peterbilt.
A. They thought that it would be a very good

Page 94

truck for me to own, that it would do the job that I needed it to do because of the low mileage, the way it had been used previously, that it would be a good truck. And they're correct, it should have been a good truck.
Q. Are there any other representations that Western Peterbilt made, other than what you've just told me and other than what is written to Interrogatory No. 5?
A. Not that I'm aware of.
Q. Were there any misrepresentations by anyone at Western Peterbilt other than what you describe in your interrogatory --
A. No.
Q. -- No. 5?
A. No.
Q. Can you think of anything that Western Peterbilt did that was trying to deceive you in any way?
A. No.
Q. Can you think of anything that Western Peterbilt did that was trying to commit an unfair act against you --
A. No.
Q. -- in any way?

Page 95

A. No.
Q. When you were talking about the information given to you by Western Peterbilt, what type of use did you tell them or explain to them you were going to have for this truck?
A. Over the road.
Q. What does that mean?
A. That means pulling a trailer over the road. I mean it's an over-the-road truck; that's what it's built for.
Q. Was the use that you explained the ordinary use that someone would use a truck like this for?
A. Yes, it is. Use them like this every day.
Q. Was there anything unusual or out of the ordinary that you were going to use this particular truck for?
A. Not -- no. No, that's what it's built for.
Q. Ken, do you have any allegation that anyone at Western Peterbilt knew that this particular truck had a problem or defect in it?
A. No.
Q. So to make maybe a more clear question: Was there anything that Western Peterbilt knew

Page 96

about this truck that they didn't tell you about that would show a problem that would cause a fire like this?
A. Not to my knowledge.
Q. Do you have any evidence or contention that Western Peterbilt knew about fires in these kinds of trucks before this incident?
A. I would not know that.
Q. What about you, given that -- well, let me go back a little bit. And I know that when I think of Peterbilt, I think of that's the truck, you know, that's the over-the-road truck.
A. Right.
Q. How many Peterbilt trucks have you owned in your life?
A. Five.
Q. And that goes back to how long?
A. 1972. No, I'm sorry, not '72. '92.
Q. What about driving trucks, because I understand you've been an owner operator before then, have you driven Peterbilt trucks?
A. Since '70.
Q. So how many trucks have you driven but not

Page 97

owned?
A. Oh, God, let's see, a 1946 White Mustang.
Q. That wasn't a Peterbilt, though, that was a White?
A. That's a White. Oh, you mean Peterbilt specifically?
Q. Well, go ahead and tell me all of them, and then we'll obviously know how many were Pete.
A. Okay. Then a cabover Freightliner for a summer for the Teamsters. Then a cabover Kenworth, which was a 1963. A cabover Kenworth -- these are two axles. It was, I believe, a '64, and then a '77 Peterbilt cabover, 110-inch cab. Then a Kenworth conventional. I don't remember the year of it. And then I bought my '85 Peterbilt, two-axle. Then I bought my '96 from Dallas Peterbilt new. Then I ordered the '99, bought that one.
Q. And that was one new, when you say that one?
A. New, from Western Peterbilt in Redding. I'm trying to think of the sales manager's name. And then this truck.
Q. Okay. So how many different dealerships have

Page 98

you bought tractor-trailer or tractors from?
A. Western Peterbilt and Dallas Peterbilt.
Q. Don't take this wrong, are you intimidated or -- I don't know, are you intimidated when you have to go in and make a truck purchase?
A. No.
Q. Is that something you're comfortable with?
A. People don't intimidate me. Policemen don't intimidate me. Lawyers don't.
Q. Well, I hope I don't.
A. No, you don't.
Q. But semi-truck --
MR. BOISSEAU: I thought I did.
THE WITNESS: No, sir, you don't. I told you you look like my brother-in-law.
Q. But suffice it to say, semi-truck salesmen don't intimidate you?
A. No, because I usually know more than they do.
Q. And was that the case here when you were buying this truck from Western Peterbilt, were you intimidated?
A. You mean from Ron?
Q. Yeah.
A. No, he didn't. He's a super nice guy.
Q. Did you feel like he had any kind of elevated

Page 99

position over you because he was selling this --
A. No.
Q. -- and you were buying it?
A. No.
Q. Did you feel like if you couldn't strike a deal with him, you could have just walked away?
A. Oh, yeah.
Q. So going back to your trucking experience, had you ever heard of any history of fires in Peterbilt trucks before this purchase of the 2005?
A. No.
Q. Did you have any knowledge of fires in Peterbilt trucks after you bought it but before the fire?
A. No.
Q. Did you understand my question?
A. Yes, I did.
Q. Okay.
A. I had to think about it, but yes, I did.
Q. That's fine. And the same rules that were, I guess, described to you earlier also apply with me.

Page 100

A. Right.
Q. If I ask a question --
A. Right.
Q. -- that doesn't make sense, you'll tell me?
A. Yes, I will.
Q. Okay. Did Western Peterbilt make any advertisements directly to you about this truck?
A. No.
Q. Did you ever see any advertisements from Western Peterbilt about this truck?
A. No, I did not.
Q. And I think you told us that you had bought a truck from them before and then an individual referred you to Western Peterbilt; is that right?
A. Yes. In Spokane.
Q. And that was John Gustafson?
A. Yes. He's bought a couple of trucks from ya, two trucks. From you.
Q. I understand. Ken, is there anything you can think of that Western Peterbilt knew about this truck that they didn't disclose to you?
A. Not --
MR. BOISSEAU: That he knows

about you mean?
MR. MURPHY: Right.
A. Yeah. Not that I'm aware of, no.
Q. Okay. As far as an express warranty or something that they expressly said the truck would do or provide to you, can you tell us anything that they expressly said about this truck?
A. You mean warranty wise?
Q. Yeah, anything.
A. Nothing warranty wise, no.
Q. They never, to make sure I'm clear, they never gave you any type of warranty on this; is this what you're saying?
A. No, they did not.
Q. Just so the record's clear, yes, that's what you're saying?
A. They never told me the truck had a warranty.
Q. And then some of the documents that you were shown --
(Deposition Exhibit No. 16 was marked for identification.)
Q. Sir I've handed you what's been marked as Exhibit 16. Does that look like your signature at the bottom of that page?



A. Yes.
Q. And it looks like it's dated 28 March 2005; is that right?
A. Correct.
Q. The caption at the top of the page reads, Truck Delivery Receipt. Do you see that?
A. Yes.
Q. And just so I'm clear, Shari -- I'm sorry?
A. Foeste.
Q. -- Foeste, is that your wife?
A. Yes.
Q. Okay.
A. Women's libber.
Q. I'm going to leave that off the record.
A. That's why she didn't change her name. I tease her about it.
Q. Right above your signature -- and I guess, again, you received the truck and you received this document; is that right?
A. Right.
Q. And you signed it?
A. Yes, I did.
Q. And right above your signature it says that "The Undersigned acknowledges receipt of the above described motor vehicle and equipment,



and assumes all risks or loss thereon"?
A. Yes.
Q. Did you read this before you signed it?
A. Probably not.
Q. You don't remember one way or the other; is that fair?
A. Probably not.
Q. I understand that, but is it a fair summary you don't remember one way or the other, reading this particular document?
A. No, I don't.
Q. Okay.
A. There was a lot of papers shoved at me.
(Deposition Exhibit No. 17 was marked for identification.)
Q. Sir, I've handed you what's been marked as Deposition Exhibit 17. Your signature's also at the bottom of that, isn't it?
A. Yes.
Q. And that actually looks like it's dated March 21st, 2005, true?
A. Yes.
Q. All right. Then up at the top, however, it has a date of 3-14-05. Do you see that?
A. Yes.



Q. Does it sound right that you made part of this deal on or around March 14, '05, and then you finished up kind of signing the documents on maybe the 21st and the 28th?
A. That's the way they've dated it, yes.
Q. What about your memory, do you recall there being kind of a, I don't know, a time gap to get all the paperwork finished?
A. No, I don't.
Q. All right. Well, Exhibit 17, right above your signature it shows "NOTE: USED VEHICLES ARE SOLD 'AS IS' WITH NO WARRANTY, unless otherwise certified by Seller in Writing." Did I read that right?
A. Yes.
Q. And you knew that, didn't you, that you were buying this vehicle as is?
A. No.
Q. What was your knowledge about how you were buying it?
A. I assumed that I would get the Peterbilt warranty on the truck like I had in the past when I bought a truck. They usually have a 100,000 mile warranty on them, three year on the engine, or 300,000 I think it is, up to

Page 109

A. Right. Normal maintenance.
Q. Mr. Smith, if you could kind of explain to us, what was your understanding of I guess your purchase of this or your lease purchase of this and from whom you were transacting. Just tell me in your words what was going to happen with kind of this complicated transaction?
A. I don't understand that at all. You lost me.
Q. Okay. I'll strike the question. Were you buying the truck or were you leasing the truck?
A. I was buying the truck through a lease purchase, $1 buyout at the end of the contract.
Q. And how did that work? When was the end of the contract?
A. At the end of the term, the contract (indicating).
Q. And who were you buying it from?
A. Western Peterbilt.
Q. And you were making payments directly to them?
A. Yes.
Q. And then at the end of that contract, as it

Page 110

shows in Exhibit 18, the purchase option price was a dollar --
A. Correct.
Q. -- is that right? Okay. And you were comfortable entering into this type of agreement?
A. Yeah, very.
Q. From the time you started this transaction, whether it's on March 14th or March 21, until March 28th, you could have had the time to go through each one of those documents and read them before Shari signed them; is that right?
A. No.
Q. You didn't have a chance to do that?
A. No. They were sent in the mail to her to sign.
MR. BOISSEAU: He had already signed them is what he's saying.
A. I had already signed them. They were shipped off. They were gone.
Q. And when Shari got them, where were you at? Were you --
A. On the road.
Q. And I guess when you were signing them, is it your testimony you didn't read the sections

Page 111

that talk about the warranty and the as-is part of it?
A. The only thing I was concerned with at that time is what I was paying for the truck, what it's going to cost me, what's the bottom line. I wasn't reading each document. It's just like I asked the young lady that when you buy a car, do you read every document you sign? Nobody does.
Q. But you could have here?
A. You could have, but nobody does.
Q. Mr. Smith, when you had issues with the, I guess, the fan, and then I think it's kind of related, but then maybe you had a separate issue with the size of the radiator, did you try to take the truck back and rescind the sale?
A. No.
Q. How come?
A. Why would I?
Q. I'll take that that you didn't have a reason that you would think you can do that; is that what you're saying?
A. There's no reason to. Peterbilt is built with a three core fan, almost every one of

Page 112

them. Unless you specify when you order a five core, that's stock, that's standard.
Q. Did you think that the fact that that clutch on the fan was maybe not operating correctly, that that was some sort of a breach of any contract you had with Peterbilt, or I guess more importantly my client, Western Peterbilt?
A. No.
Q. Why not? Why didn't you think that Western Peterbilt did anything wrong because that fan didn't operate correctly in the clutch?
A. They didn't -- they didn't build it.
Q. And did they make any representations to you about the fan was going to operate correctly?
A. No.
Q. And they didn't make any representations to you that the fuel line was going to act properly, just the same, true?
A. Right.
Q. I think you testified that you didn't know what the value of this truck was after the fire --
A. Correct.
Q. -- is that right? And, again, I don't mean

Page 113

this as any kind of insult, but you're not an expert in the cost or the value of used 2005 Peterbilt trucks, are you?
A. No.
Q. So are you asserting any expertise in this case about what the value of this truck was at the time when it caught fire?
A. No. That's why I told you I had to go look at a truck paper to find out what the value of it was.
Q. And what about now, do you consider yourself having personal knowledge what the value of the truck was at the time of that fire?
A. Yes. What I insured it for.
Q. And what's your basis for that knowledge?
A. I would have to refer to current sales what the value of the truck is.
Q. Okay. So if I'm hearing you right, you could come up with that number by trying to find some research on it; is that what you're saying?
A. Right.
Q. But as it stands now, do you have your own independent knowledge or expertise about what the value of a truck like that was at the

Page 114

time of the fire?
A. Only if I research it. That's the only way.
Q. Okay. And you don't have any expertise in a the cause and origin of tractor truck fires, do you?
A. No.
Q. And you're not testifying here today as an expert on the cause of this particular fire, are you?
A. No, I'm not.
Q. And you're not going to testify as an expert about the cause of the fire at trial, are you?
A. No.
Q. Is there any other information you have about the history of truck fires on Peterbilt trucks, other than what you've told Ms. Morgan [sic] this morning?
A. No.
MR. MURPHY: I called you Ms. Morgan. I'm sorry.
MS. DECKER: That's okay. I've been called worse.
THE WITNESS: I'm not going to touch that with a ten-foot pole.

Page 115

MR. MURPHY: Kind of like the women's lib comment, right?
THE WITNESS: That's my wife.
MR. BOISSEAU: Within boundaries.
THE WITNESS: It's all in the DNA, but she's a sweetheart.
MR. MURPHY: Mr. Smith, I don't believe I have any further questions at this time.
MS. DECKER: I just have a few follow-ups. I won't take long.
THE WITNESS: Good.

REDIRECT EXAMINATION

BY MS. DECKER:
Q. There was a reference in the documents about the evaporator having been repaired?
A. Evaporator?
Q. Do you know what that reference is?
A. I don't have any idea what you're talking about -- oh, evaporator for air-conditioning.
Q. Okay. And what was wrong with the evaporator?
A. I don't remember.
Q. And I'm going to follow up with my same questions that Mr. Murphy had about his

Page 116

client on the allegation of deception and unfair acts. Same with my client. Do you contend that Peterbilt deceived you in any way when you purchased the truck?
MR. BOISSEAU: I just want to make clear, he's not a lawyer, so you can ask him all the fact questions you want to, that's fine, but my objection is you're trying to ask him a legal question and tie it in. But go ahead and answer her questions factually as best you can.
A. No, I'm not an expert.
Q. And the same with PACCAR, do you contend that PACCAR deceived you in any way?
MR. BOISSEAU: Same objection.
A. No.
Q. When you said you fixed your new truck that you're currently driving, the first thing that you did was repair the fuel line. What exactly did you do to the fuel line to repair it?
A. I didn't.
Q. Okay.
A. The dealership did.
Q. Okay.

Page 117

A. They replaced it, moved it out of the wiring harness so this can't happen again.
Q. Okay. And the gentleman that was the tow person, Robert --
A. Robert.
Q. -- was his name -- did he actually inspect the truck at the time that he told you "I know exactly what happened"?
A. No.
Q. And do you know if he ever inspected the truck?
A. No.
Q. Do you know how long the truck was at Robert's tow yard before it was moved to some other location?
A. No, I don't.
Q. And it was moved to another location, correct?
A. Yes.
Q. Did your wife have any contact with Peterbilt --
A. No.
Q. -- through this process? Did she have any contact with PACCAR through this process?
A. No.

Page 118

MS. DECKER: That's all the questions I have.
MR. MURPHY: Briefly.
RECROSS EXAMINATION
BY MR. MURPHY:
Q. In the incident itself, Mr. Smith, did you ever shut the truck off?
A. Yes.
Q. Okay. And tell me what happened with the events there. You told us earlier that you set the brakes --
A. Right.
Q. -- and it was still moving. When did you shut the vehicle off?
A. Immediately.
Q. Immediately when?
A. When I set the brake.
Q. Just walk us through what transpired with that so we can visualize it.
A. You pull the little yellow knob, which sets the brakes, you turn your key off, I grabbed my dog and I step out of the truck.
Q. And this will sound like a stupid question and it is, but --
A. There is no such thing.

Page 119

Q. Well, not in a deposition there's not hardly because we really can't assume things, but I am aware that, and I think you talked about it earlier, sometimes you'll have fans that will continue to run even though the motor is shut off?
A. Correct.
Q. Was there anything in this vehicle that would cause the fuel pump to still be pumping fuel even though the vehicle was shut off?
A. That, I can't answer.
Q. Was the motor still running when you departed the truck?
A. It was trying to.
Q. Even though you had shut off the ignition?
A. Even though I had shut off the key.
Q. And when you say "it was trying to," what do you mean by that?
A. Well, like it -- it was trying to still run, like it was still being fed fuel. It was still trying to run.
Q. Was there any type of mechanism that you could use to shut off the fuel supply?
A. No.
Q. There's --

Page 120

A. Only on the fuel tanks. I don't think you want to crawl under the truck and do that when it might be on fire.
Q. In other words, in fairness to you, I was thinking about in the cab, there's not a switch or something?
A. The ignition switch is the only thing you have.
Q. The only other way to shut off the fuel would be to crawl underneath it?
A. That's correct.
Q. How far did you travel from the time you first smelled the fuel until the time when you pulled off into the rest area?
A. Between a quarter of a mile and a half a mile.
Q. I suppose we can look at the map, but how far north of Beto Junction is the rest area?
A. I'm going to guess between three and five miles. It isn't there any more.
Q. The rest area is not?
A. No. It's gone.
Q. Is maybe the concrete and the drive still there but they've taken it out of service?
A. No, it's gone.

Q. Oh, the whole --
A. The whole thing's gone. They took it out for some reason.
Q. Okay. When you were -- let me ask it this way. From the time you first smelled diesel fuel until the time you saw smoke, how much time went by?
A. Well, you're only going -- 30, 40 seconds. You're only going a quarter a mile or half a mile. At 60 miles an hour, it doesn't take long.
Q. Okay. So it was 30 or 40 seconds from the time you first smelled the smell of diesel fuel until the time you saw smoke in the cab?
A. Right. When you're going down the road and if you have any kind of vapors, smoke or anything like that at 65 miles an hour, it's going to be behind you. It's not going to be in the cab unless you actually have a huge fire at that time. When you slow down, then you're going to get it in the cab.
Q. When did you first have the huge fire, in your belief?
A. When I stepped away from the truck, about 20 seconds after I parked it, that's when I saw



the flame burst in the blue and orange.
Q. You could have stopped your tractor and load when you first smelled the diesel fuel, couldn't you?
A. In the middle of the freeway or two-lane highway, yes, I could have.
Q. Why did you choose not to?
A. Because I had a 15-foot wide load on. The safest thing to do is get off the road.
Q. And by safety, you mean traffic passing you?
A. For everybody, including me. Get off the road. It's not a thought process. It's immediate. You think -- you don't think about it. You just do it.
Q. When you say "it," you mean drove until you found a place to pull over?
A. Right. That's a quarter of a mile, maybe a half. It's not very far.
Q. And when did you know where the next rest area was?
A. I didn't. I asked my pilot car to find me a wide spot and he was at that point already because he's got to maintain a certain amount of distance in front of me. He said, "There's a rest area right here." I said,



"Great. Get off."
Q. And that's when you knew that then --
A. Right.
Q. -- when he told you?
A. I did what -- that's how I knew it was there.
MR. MURPHY: That's all the questions I have.
MS. DECKER: I just want to clarify a couple of things on these pictures. Is that okay?

FURTHER DIRECT EXAMINATION

BY MS. DECKER:
Q. On Exhibit 4 where it showed your truck prior to the fire --
A. Uh-huh.
Q. -- do you have any idea when this picture was taken?
A. You mean the date? No.
Q. Yeah. But it's not a photograph of the load that you were hauling on that particular day?
A. Oh, no. See, this is a step-deck trailer. I was pulling a double-drop.
Q. So do you know why this picture was taken?
A. Yeah. Because it's pretty.
Q. Okay.



A. It's a nice picture.
Q. And then do you know who took the photograph that's Exhibit 6?
A. Fred.
Q. The insurance adjuster?
A. Insurance adjuster.
Q. And same with Exhibit 5?
A. Right.
MS. DECKER: Okay. For the last time, that's all I have.
THE WITNESS: And I have one similar to that.
MR. BOISSEAU: Do you have any more?
MR. MURPHY: No.
MR. BOISSEAU: Okay. We'll read and sign.
THE REPORTER: Where shall I send it for signature?
MR. BOISSEAU: What you better do is send it to me and I'll overnight it to him.
(Deposition concluded at 12:02 p.m.)

KENNETH R. SMITH 1-27-10

I have read or have had read to me the foregoing testimony recorded on pages 5 to 124, inclusive, and the same is true and correct to my knowledge and belief.

KENNETH R. SMITH (Date)

STATE OF )
) ss:
COUNTY)

Subscribed and sworn to before me, the undersigned authority, this, the day of

, .

Notary Public

(Commission Expires)

SMITH vs. PACCAR, et al.



CERTIFICATE

STATE OF KANSAS)
) ss:
SEDGWICK COUNTY)

I, VESTA L. YORK, a Certified Shorthand Reporter for the State of Kansas, do hereby certify that the within-named witness was by me first duly sworn to testify the truth, that the testimony given in response to the questions propounded, as herein set forth, was first taken in machine shorthand and reduced to writing with computer-aided transcription, and is a true and correct record of the testimony given by the witness. I certify that review of the testimony was requested by the witness or the parties. If any changes are made by the deponent during the time period allowed, they will be appended to the transcript.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

WITNESS my hand and official seal at Wichita, Sedgwick County, Kansas, this day of

, .

VESTA L. YORK, CSR, CRR
220 Orpheum Centre
200 North Broadway
Wichita, KS 67202

500,000, depending on how you purchase it, so that's what I assumed.
Q. And I think you've told us that the one most recent, the '99 was the one that you ordered and had to wait on?
A. Yes.
Q. Is that how you base your knowledge on the Peterbilt warranty --
A. Yes.
Q. -- was on that '99?
A. Yes.
Q. And so you --
A. That's one of them, yes.
Q. What's the other one?
A. Friends that have bought trucks from Peterbilt.
Q. New trucks?
A. New trucks.
Q. All right. You knew this wasn't new because you had learned that it had towed around aircraft --
A. Right.
Q. -- equipment or parts, and had around 42,000 miles on it?
A. Did it? Is that all it had?



Q. Well, maybe it was --
A. I don't know. I don't remember.
Q. But you knew it was a used truck?
A. Yes.
Q. And it was your belief that a used truck also had that warranty?
A. Yes.
Q. And did anyone from Western Peterbilt tell you that?
A. No.
Q. That was just your assumption?
A. That was my assumption.
(Deposition Exhibit No. 18 was marked for identification.)
Q. Ken, we've handed you Exhibit 18. Down at the bottom lower left corner, this is your signature, correct?
A. Correct.
Q. On both pages of 18?
A. Yes.
Q. I can't quite tell, does it also have Ms. Foeste?
A. Shari?
Q. Shari, yeah.
A. Yes.



Q. Is that her signature?
A. Yes.
Q. She signs her signature so well after she prints it, I wasn't sure if that was a signature. But she must have been there at the same time signing this Long Term Lease Agreement?
A. No, she wasn't. She was at home.
Q. Oh.
A. That's why the span in the dates because they had to send these documents to her to sign them and then bring them back.
Q. I got you.
A. She wasn't with me.
Q. Okay. So where were you at when you signed these March 28 documents? Were you like at home with her?
A. No. I was at the dealership when I signed them. I went to work after I signed them, and then they sent these to her.
Q. I see. Do you know what date you signed them?
A. No, I don't.
Q. Okay. Well, in any event, on the first page down at the bottom we've got some numbers on



there, it says WP 67, and kind of above the signature lines there's a section that says, "The customer is responsible for: Maintaining all fluid; all lubricant levels; all tire damage; and any and all damages to the equipments"; is that right?
A. That's what it says.
Q. And you knew that was the case when you were leasing, didn't you?
A. I knew that's what you do with a truck, yes.
Q. Then on the second page of Exhibit 18 there's a similar quote again right above the place where the people sign their names. Do you see that?
A. Yep.
Q. And, again, you were aware of that in the Long Term Lease Purchase Option, right?
A. It's like I said before, you get handed a lot of documents, you just sign them, you don't read them.
Q. Sure, I understand that. You knew maybe without even reading this that you were responsible for maintaining those fluid and lubricant levels, tire damage and any and all damages to the equipment?