IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| K R SMITH TRUCKING LLC,<br><br>Plaintiff,<br>vs.<br><br>PACCAR Inc, and PETERBILT MOTORS COMPANY, a division of PACCAR, Inc, and WESTERN PETERBILT, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 8-CV-01351-WEB-KGG |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT WESTERN PETERBILT, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, K.R. Smith Trucking, L.L.C., by and through its attorney of record, Eldon L. Boisseau, of the Law Offices of Eldon L. Boisseau, L.L.C., and presents to the Court the following response to Defendant Western Peterbilt, Inc.'s Motion for Summary Judgment. (Doc. ## 98 and 99.) In opposition to said Motion, Plaintiff would respond as follows:

**INTRODUCTION AND BACKGROUND**

In approximately 2004, defendant Peterbilt designed, manufactured, assembled and delivered into the stream of interstate commerce a 2005 Peterbilt Model 379 truck, serial number 1XP5DB9X05D841577. It was originally used by Boeing. Later, the truck was placed in the possession of defendant Western Peterbilt for resale. On March 14, 2005, K.R. Smith Trucking, L.L.C., through K.R. Smith, agreed to purchase the truck for the sum of $114,620.00. The truck was sold as a low mileage truck, with about 42,000 miles, by Western Peterbilt of Spokane, Washington. Although plaintiff considered it a sale, the paperwork he was later given to sign on March 28, 2005, termed the transaction

as a long-term lease with an option to purchase. Paccar/Peterbilt Motors Company financed the transaction through a subsidiary financing company, Paccar Financial. In addition, according to the terms of the lease agreement, Paccar, Inc. and Peterbilt Motors Company also agreed to provide customer support to plaintiff, as purchaser of the subject truck, including access to service bulletins, manual revisions, website information, and other financial services.

On September 18, 2007, the truck in question was being driven by K.R. Smith under normal and ordinary operating conditions on I-35 near Lebo, Kansas, when, without warning, the truck engine caught on fire, engulfing the truck in flames. Fortunately, driver Smith was able to get the truck off the road and escaped injury; however, the entire truck was destroyed by fire.

## STATEMENT OF UNCONTROVERTED FACTS

Plaintiff makes the following responses to Defendants' Statement of Uncontroverted Facts:

1. Admitted in part and denied in part. Plaintiff agreed to purchase the truck on March 14, 2005, which is evidenced by the date on the Customer Purchase Order (Ex. A.) He sent the document to his wife, she signed it and it was sent back. (Ex. D, p. 101, line 19 through p. 102, line 25.) The Customer Purchase Order was then signed by him on March 21, 2005. It was not until March 28, 2005, that the Long Term Lease Agreement (Ex. C.) prepared and signed by the parties was signed by him. (Ex. D, p. 99, line 19 through p. 100, line 14; Exhibit Nos. 17 and 18 thereto.)

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted in part and denied part His deposition testimony consisted of numerous pages and his testimony speaks for itself.

6. Admitted.

7. Admitted.

8. Admitted.

9. Admitted in part and denied in part. He testified that he could not think of anything that he was told that was unfair. He also stated that he was not told the truck was at risk for catching fire and burning up.

10. Admitted. It is true that defendants did not send any advertisements directly to plaintiff; however, defendants did advertise the truck for sale in various publications that reached plaintiff and were read by him prior to the time he went to Spokane, Washington, to attempt to

purchase a truck from defendants.

11. Admitted.

12. Admitted, except as qualified below in the Additional Statement of Uncontroverted Facts. Plaintiff thought the truck had warranties on it because it was a virtually new truck with only 40,000 miles. In the past, other trucks had 100,000 mile warranties and 300,000 miles on the engine. He assumed given the fact the truck was nearly new, these same warranties would apply. (Ex. D, p. 23, lines 17-25; p. 25, lines 10-25.) He was never told or given any information that the truck did not have any warranties on it. (Ex. D. p. 28, line 11 through 32, line 11; p. 99, line 15 through p. 101,

line 17.) It was not until he signed the final papers that anything was presented that mentioned warranties. He initialed the document but did not read it.

13. Admitted, except as qualified below in the Additional Statement of Uncontroverted Facts. At the time he purchased the truck, he was not aware Western Peterbilt had hidden any information about defects in the truck. (Ex. D, p. 96, lines 8-14.) He was never told the truck could catch fire because of some problem with the fuel line. (Ex. D, p. 31, line 10-17.)

14. Admitted, except as qualified below in the Additional Statement of Uncontroverted Facts. Plaintiff agreed to purchase the truck on March 14, 2005, which is evidenced by the date on the Customer Purchase Order. (Ex. A.) He sent the document to his wife, she signed it and it was sent back. (Ex. D, p. 101, line 19 through p. 102, line 25.) The Customer Purchase Order was then signed by him on March 21, 2005. It was not until March 28, 2005, that the Long Term Lease Agreement was prepared and signed by the parties. (Ex. D, p. 99, line 19 through p. 100, line 14; Exhibit Nos. 17 and 18 thereto.)

15. Admitted, see ¶¶ 13 and 14, above.

16. Admitted, see ¶¶ 13 and 14, above.

17. Admitted, see ¶¶ 13 and 14, above. However, that did not include responsibility for the truck catching on fire and burning up because it was sold with a defect in the fuel system.

18. Admitted, see ¶¶ 13 through 17, above. However, plaintiff contends this language is invalid under Washington law.

19. Admitted, see ¶¶ 13 through 17, above. However, plaintiff contends this language is invalid under Washington law.

20. Admitted; however, that does not mean he knew about the defects in the fuel line about which they failed to tell him. See ¶ 13, above.

21. Admitted, see ¶¶ 37 through 40, below.

22. Admitted.

23. Admitted that he speculates to such facts, without any evidence of the same.

24. Admitted.

## ADDITIONAL UNCONTROVERTED FACTS

Plaintiff asserts the following additional facts in response to defendant's motion for summary judgment:

25. Plaintiff was looking to buy another truck to replace the one he was currently driving. He always drove, and preferred, a Peterbilt. (Ex. D, p. 10, lines 11-13; p. 21, lines 7-10.) However, plaintiff could not afford to buy a new truck.

26. A friend had purchased a Peterbilt from Western Peterbilt and recommended it. (Ex. D, p. 9, lines 16-25.) Smith made arrangements to get a load in the Spokane, Washington area so he could go to Western Peterbilt to look for a truck. (Ex. D, p. 11, lines 1-11.) He had also looked in the Medford, Oregon area. (Ex. D, p. 12, lines 21-24.)

27. When plaintiff went to Western Peterbilt, he looked at several trucks on the lot. (Ex. D, p. 11, lines 23-25.) Some of the trucks were simply too expensive for him to purchase. Eventually, he found this truck and became interested in it. He spoke

with Ron, the salesman. He had never met him previously. (Ex. D, p. 14, lines 13-25.) He doesn't know who started the negotiations. (Ex. D, p. 14, lines 2-6.) One of the big issues was the amount he would be given for a trade in on his truck. Ron had to work through his manager during the negotiations. (Ex. D, p. 18, lines 10-17.)

28. Plaintiff went back to Western Peterbilt several times before he decided to buy the truck. (Ex. D, p. 16, lines 8-11; p. 17, lines 16-24.)

29. After he worked out an agreement to buy the truck, Ron turned him over to Alan and they started working on the financing and terms and conditions of the financing agreement. (Ex. D, p. 19, lines 2-12; p. 21, lines 21-22.)

30. Plaintiff agreed to purchase the truck on March 14, 2005, which is evidenced by the date on the Customer Purchase Order. (Ex. A.) He sent the document to his wife, she signed it and it was sent back. (Ex. D, p. 101, line 19 through p. 102, line 25.) The Customer Purchase Order was then signed by him on March 21, 2005. It was not until March 28, 2005, that the Long Term Lease Agreement was prepared and signed by the parties. (Ex. D, p. 99, line 19 through p. 100, line 14; Exhibit Nos. 17 and 18 thereto.)

31. At the time he purchased the truck, he was not aware Western Peterbilt had hidden any information about defects in the truck. (Ex. D, p. 96, lines 8-14.) He was never told the truck could catch fire because of some problem with the fuel line. (Ex. D, p. 31, line 10-17.)

32. Plaintiff thought the truck had warranties on it because it was a virtually new truck with only 40,000 miles. In the past, other trucks had 100,000 mile warranties and 300,000 miles on the engine. He assumed given the fact the truck was nearly new,

these same warranties would apply. (Ex. D, p. 23, lines 17-25; p. 25, lines 10-25.) He was never told or given any information that the truck did not have any warranties on it. (Ex. D. p. 28, line 11 through 32, line 11; p. 99, line 15 through p. 101, line 17.) It was not until he signed the final papers that anything was presented that mentioned warranties. He initialed the document but did not read it.

33. At the time he purchased the truck, he was not aware Western Peterbilt had hidden any information about defects in the truck. (Ex. D, p. 96, lines 8-14.) He was never told the truck could catch fire because of some problem with the fuel line. (Ex. D, p. 31, line 10-17.)

34. Plaintiff later had some mechanical problems with the truck. It then he learned for the first time that there were no warranties remaining on the truck despite its low mileage. (Ex. D, p. 25, lines 10-17.) He was then told it was too late for him to do anything about it.

35. This transaction was characterized as a “sale” on the Sales Invoice. (Ex A, p. 1.) However, it was also described as a “Long Term Lease Agreement.” (Ex. B, p. 2.) The parties were K.R. Smith and Shari A. Foeste, d/b/a KR Smith Trucking, as Co-buyers/Lessees, and Western Pacific Leasing, Inc. (a PacLease Division, which is a division of Paccar, Inc.) as seller.

36. The actual lease agreement is a five page document consisting of two pages of forms with blanks (Ex. C, pp. 1-2.) and three pages of standard boiler-plate form language. (Ex. C, pp. 3-5.)

37. Robert Harsch testified as a fact witness in this case. He was the tow truck owner/operator who responded to the fire and towed the Peterbilt to his garage in Lebo,

Kansas. He testified he also owns 13 semi-tractors and about 50 trailers and is actively involved in the over-the-road trucking business. (Ex. E, p. 39, lines 6-13; p. 41, lines 2-4; p. 44, lines 22-24.) He testified that he knew what caused the fire in this case as soon as he saw the truck because he has seen it on previous occasions. (Ex. E, p. 11, lines 9 through p. 12, line 22; p. 14, line 15 through p. 17, line 25.) He has seen many fuel leaks in Peterbilt trucks, where the fuel line has rubbed against some other part of the engine and developed a hole resulting in leaking fuel. In fact, he has seen one other fire because of leaking fuel. (Ex. E, p. 24, lines 22 through p. 34, line 23.) He testified that all these trucks have this potential problem and it is well known in the industry. (Ex. E, p. 14, lines 2-7; p. 32, lines 14-22.) The fuel line installed at the time of manufacture is weak and susceptible to developing holes. In fact, he makes it a practice to switch all the fuel lines on his trucks as soon as he gets them and replaces the manufactured fuel line with one not susceptible to developing holes and leaks. (Ex. E, p. 49, line 24 through p. 50, line 6.) He owns and runs a truck repair shop. In that shop, he replaces failed fuel lines on trucks like this frequently. In his deposition, he produced work orders and repair documents reflecting numerous times in the past several weeks before his deposition he has replaced faulty fuel lines on trucks like plaintiff's truck. (Ex. E, p. 12, line 23 through p. 13, line 25; p. 15, line 15 through p. 16, line 9; p. 25, line 20 through p. 31, line 18; p. 50, p. 11 through p. 61, liner 17.)

38. Rodney Curbo, a company representative of Paccar/Peterbilt, admitted that he had investigated about 50 fires involving Peterbilt trucks with Caterpillar engines. (Ex. F. p. 23, lines 5-7.) He also testified that there was nothing in any of the material that Peterbilt provided to truck owners that warned them of a risk of fuel line problems or

engine fires resulting from fuel line leaks. In fact, the material provided advised drivers they were not expected to be a "professional mechanic." (Ex. F, p. 43, line 19 through p. 46, line 7.)

39. Richard Dyer was designated as a fire expert for Paccar. He testified he has been involved in five previous Peterbilt truck fires. (Ex. G, p. 11, lines 20-25.) He agrees the evidence shows that the fuel line on this truck had a hole in it. (Ex. G, p. 18, lines 3-6; p. 32, lines 5-14; p. 35, lines 8-25; p. It was his opinion that an electrical arc was the ignition source of the fire. (Ex. G, p. 11, lines 20-25.) He agreed that the fire could have happened in two ways, one of which was opined by plaintiff's experts. (Ex. G, p. 18, lines 4-14.) Either electrical arcing caused a hole to burn into the fuel line allowing fuel to escape and become fuel for a fire that occurred because of the arcing, or a hole wore into the fuel line and electrical arcing triggered a fire. Either way, a leak in the fuel line and electrical arcing together caused the fire that consumed the truck. (Ex. G, p. 19, line 6 through p. 20, line 1l; p. 26, line 22 through p. 23, line 25; p. 30, lines 11-23; p. 39, line 19 through p. 42, line 6.)

40. Western Peterbilt's experts, Lawrence Berg and Joseph D. Smith, wrote a report with similar opinions. (Ex. H; Ex. I, p. 23, line 16 through p. 25, line 20; p. 36, line 6 through p. 37, line 15.)

41. The original contract for sale of the truck was between plaintiff and Western Peterbilt. (Ex. A.) However, the later agreement turned it into a long term lease between plaintiff and Western Pacific Leasing. (Ex. B.) The final documents, which are the lease and financing documents, are between Western Leasing. (Ex. C.) This is the document which, for the first time, contains the warranty disclaimer. Western Pacific

Leasing is part of PacLease and Paccar Financing, which are subsidiaries of Paccar, Inc. This information was obtained on Paccar, Inc.'s website, at www.paccar.com, which includes its Annual Report and its SEC 10K filings. (Ex. J.) Page 74 indicates the company involved in the leasing and financing in this case are subsidiaries of Paccar, Inc. In other words, the lease and financing agreement are between plaintiff and a subsidiary of Paccar/Peterbilt, creating privet of contract between them.

## ARGUMENTS AND AUTHORITIES

### I. CHOICE OF LAW—WASHINGTON LAW APPLIES.

Under the facts of this case, Washington law applies. *Cox v. Lewiston Grain Growers, Inc.*, 86 Wash. App. 357, 365-67, 936 P.2d 1991 (1997). This Court already made this ruling in its Memorandum and Order (Doc. #21.) on defendants' Motion to Dismiss. Furthermore, the parties all appear to agree this lawsuit is subject to application of Washington law.

### II. DFENDANT WESTERN PETERBILT VIOLATED THE WCPA.

Defendant Western Peterbilt spends the majority of its brief incorrectly claiming the WCPA does not apply to this case.

This Court spent a major portion of its time in the Memorandum and Order (Doc. #21, pp. 3-9.) ruling on defendants' motion to dismiss considering the application of the WCPA to this case. It ultimately ruled that the Washington CPA applied. That ruling was correct both from a factual and legal standpoint and it should stand.

Plaintiff has a valid WCPA claim in this case. A plaintiff is required to establish five elements in order to show a violation of the WCPA. They are:

1. An unfair or deceptive act or practice

2. In trade or commerce

3. which affects the public interest

4. a showing of injury to plaintiff in his business or property, and

5. a causal link between the unfair or deceptive act and the injury suffered.

*Travis v. Washington Horse Breeders Ass'n, Inc.*, 111 Wash.2d 396, 405, 759 P.2d 418 (1988); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 784, 719 P.2d 531 (1986); *Griffith* ***v. Centex Real Estate Corp.***, 93 Wash. App. 202, 213-14, 969 P.2d 486 (1998); *Potter v. Wilbur-Ellis Co.*, 62 Wash. App. 318, 326, 814 P.2d 670 (1991).

The WCPA is to be liberally construed so that its purpose of protecting the public be served. *Pang v. Farmers Ins. Co. of Washington*, 166 Wash.2d 27, 37, 40, 204 P.3d 885 (2009); *Short v. Demopolis*, 103 Wash.2d 52, 61, 691 P.2d 163 (1984)

**A. <u>An Unfair or Deceptive Act or Practice</u>**

Failure to disclose a material fact can be a deceptive act under the CPA. *Griffith* ***v.*** *Centex* ***Real Estate Corp.***, *supra; Potter v. Wilbur-Ellis Co.*, *supra* at 326. There is no requirement that the seller intend to deceive the buyer when failing to disclose the material fact. In fact, a plaintiff does not have to actually be deceived. It is enough that the plaintiff can show that the defendants' actions possessed a tendency or capacity to mislead in order to prove an unfair or deceptive act. *Travis v. Washington Horse Breeders Ass'n, Inc.*, *supra* at 406; *Smith v. Sturm, Ruger & Co., Inc.*, 39 Wash. App. 740, 747-48, 695 P.2d 600 (1985).

A seller has a duty to disclose facts material to a transaction when the facts are known to the seller but not easily discoverable by the buyer. *Griffith* ***v. Centex Real***

***Estate Corp.***, *supra* at 214-15; *Testo v. Russ Dunmore Oldsmobile, Inc*., 16 Wash. App. 39, 51, 554 P.2d 349 (1976). This includes a duty to disclose known defects in a product. *Ibid*. Western Peterbilt breached that duty when it failed to disclose that Peterbilt trucks have faulty fuel lines that have a propensity to fail and cause truck fires.

Whether a particular act is unfair or deceptive is a question of law for the Court to determine. *Pang v. Farmers Ins. Co. of Washington*, *supra* at 47; B*lake v. Federal Way Cycle Ctr*., 40 Wash. App. 302, 309, 698 P.2d 578, *rev. denied*, 104 Wash.2d 1005 (1985); *Potter v. Wilbur-Ellis Co*., *supra* at 327. The CPA does not define "unfair and deceptive" and the Court must interpret the same. *Testo v. Russ Dunmire Oldsmobile, Inc*., *supra* at 50-51.

As the court stated in *Testo,*

> A buyer and seller do not deal from equal bargaining positions when the latter has within his knowledge a material fact which, if communicated to the bjuyer, will render the goods unacceptable or, at least substantially less desirable. Failure to reveal a fact which the seller is in good faith bound to disclose may generally be classified as an unfair or deceptive act due to its inherent capacity to deceive and, in some cases, will even rise to the level of fraud. (Citations omitted.)

*Id.* at 51; *Potter v. Wilbur-Ellis Co*., *supra* at 327.

Recent cases have held that in order for conduct to be actionable it must have a tendency to deceive a substantial portion of the public. *Blake v. Federal Way Cycle Ctr*., *supra* at 310; *Potter v. Wilbur-Ellis Co., supra* at 327. This can be proven in a number of ways. In *Potter v. Wilbur-Ellis Co*., *supra*, the court stated:

> A retailer has the capacity to aim a particular representation at any number of customers. Its misrepresentations are often heard only by one targeted customer, particularly in a sales presentation at the customer's place of business. Nonetheless, this sales presentation is not intended to make sales to only one customer. This conduct affects a multitude of customers, which in this case, included Green Baron. Conduct need only to have the

> capacity to deceive a substantial portion of the public. *Hangman Ridge*, 105 Wash.2d at 785, 719 P.2d 531. A false statement which is communicated to only one customer but which is contained in a standard form contract, sales materials, or routine sales presentation would have this capacity. . . .

Thus, the fact that defendants use printed boiler-plate forms to conduct sales/lease transactions makes it abundantly clear this is part of their standard business practice, which, *ipso facto*, demonstrates that other members of the public are also affected by defendants' deceptive business practices.

**1. The Defect Is A Design, Manufacturing Defect.**

Defendant Western Peterbilt argues that plaintiff cannot show there was a defect with the truck at the time it was sold. (Defendant's Brief, p. 11.) That is not true. The facts show that defect is due to a design/manufacturing defect. The fuel line is weak. It either rubs against other parts of the engine and develops a leak, or the line fails due to an electrical arc. In either event, fuel leaks onto the engine and is ignited, catching the truck on fire. Even defendants' experts admit this is the likely cause of the fire. One expert has handled fifty truck fires due to fuel leaks. Mr. Harsch testified this is a common problem with Peterbilt trucks. In fact, he makes such repairs all the time. He is so concerned about that he changes the faulty fuel lines on his trucks to prevent possible fuel fires. The defect in this truck existed from the moment the truck was originally manufactured.

Western Peterbilt also alleges, but does not have any evidence, that the electrical lines may have been altered. At this point, that is speculation. But even if true, this ignores the fact that the fuel lines are weak, they develop leaks and, as a result, engine

fires develop, like the one in this case. These issues are fact issues which are in the domain of the jury and are not proper subjects for summary judgment.

### 2. Western Peterbilt Has Imputed Knowledge of the Defect

Western Peterbilt then argues there is no evidence it knew of the defect. (Defendant's Brief, pp. 12-13.) It is hard to believe that an authorized Peterbilt dealer is not aware of the regular failure of fuel lines. Apparently, it is a fairly common problem.

But in any event, it does not matter. Any knowledge of Peterbilt Motors and Paccar is imputed to Western Peterbilt, as the seller and agent for Peterbilt and Paccar. Defendant Western Peterbilt is in a direct contractual relationship with Peterbilt Motors, Inc. and Paccar, Inc., which makes it legally liable for the defects in the truck. The original sales contract was between plaintiff and Western Peterbilt. Then, in later documents they all entered into a mutual contractual relationship when plaintiff and Western Pacific Lease (PacLease), which is a subsidiary of Paccar/Peterbilt, entered into the lease agreement and the financing agreement with plaintiff. This creates the privity of contract between plaintiff and all defendants. In fact, the disclaimer of warranty, which is a major issue in this case, never shows up in any document which plaintiff and Western Peterbilt signed. It shows up for the first and only time in the lease/financing agreement between plaintiff and defendant Paccar (Western Pacific Leasing/PacLease).

This misconception has caused another major error in this case. In ruling on defendants' motions to dismiss filed early in this case, this Court dismissed plaintiff's implied warranty and express warranty claims with these same defendants because the Court found no privity. (Doc. #21, pp. 6-13.) This ruling was made at a time when there had been no formal discovery in this case. The Court did not have Exs. A-C, and J before

it when it made that ruling. Based on the evidence produced during discovery and made a part of this Response, the Court's ruling dismissing those claims was clearly wrong. Plaintiff asks the Court to reconsider those rulings based on arguments made by these defendants in both motions for summary judgment, along with the evidence presented in its both responses by plaintiff.

### 3. Misrepresentation Is Demonstrated by Concealment.

Defendant Western Peterbilt then argues that there is no evidence any misrepresentation has occurred. (Defendant's Brief, pp. 13-15.)

While it is true plaintiff testified that he did not know of any facts that would support a misrepresentation claim, he also testified that no one told him there was a defect in the fuel lines that could cause the truck to catch on fire. Under *Test* and the other cases cited above, failure to disclose a material fact known to the sellers constitutes concealment of a material fact and, therefore, misrepresentation under the WCPA. It can hardly be argued that the fact that a truck has a propensity to experience fuel line failures, which can result in a catastrophic engine fire is not a material fact. This would be particularly true when, according to Mr. Harsch, the problem can be remedied by spending about a hundred dollars to replace the fuel line.

Defendant Western Peterbilt also argues that the fact plaintiff drove the truck for two years is proof there was no defect. The truck in question was an extremely expensive truck, either new or used. It was designed, manufactured and sold for use in over-the-road trucking. It was intended to be used to drive hundreds of thousands, if not more than a million, miles, not just 280,000 miles.

Furthermore, a truck that can suddenly catch on fire at any time, either from a fuel line failure caused by electrical arcing, or by fuel line failure caused by vibration, can hardly be called a "very good truck."

**4. Plaintiff Was Mislead by Defendants' Nondisclosure.**

Finally, defendant Western Peterbilt argues that summary judgment should be granted because plaintiff was not mislead. (Defendant's Brief, pp. 15-16.) Once again, defendant misapprehends the facts.

Plaintiff was mislead because he was not told about a material fact concerning the fuel lines. It does not matter what plaintiff knew or thought he knew about Peterbilt trucks. It does not matter that he may know a great deal about the trucks, if defendants fail to disclose a material fact that he does not know, or he should know. In this case, plaintiff may have thought a Peterbilt truck was a "very good truck" but that perception is erroneous if it is based on incomplete information, or if defendants fail to tell him something is wrong with the truck that he should know—such as the propensity for the fuel lines to fail and cause engine fires.

Defendant's arguments seem to imply that plaintiff should have asked Western Peterbilt if there was a problem with fuel lines, or he should have asked whether Peterbilt trucks had a propensity for engine fires. The law does not place a duty on buyers to pose an endless, exhaustive list of questions about possible flaws with a truck before its purchase. Rather, the law imposes a duty on the seller to disclose known, material defects before purchase. Defendants do not allege that they told plaintiff about the defect. Instead, they argue that they should be granted summary judgment on the basis

that it is permissible for them to not tell plaintiff about the defect. This should not be permitted.

**B. <u>In Trade or Commerce</u>**

There is no issue that the sale of the Peterbilt tractor occurred in trade or commerce. One of the defendants is in the business of manufacturing this truck and the other was engaged in the business of selling both new and used Peterbilt trucks. These trucks are used all over the country in interstate trucking operations. The transaction in this case took place in the State of Washington and, therefore, is subject to the WCPA. RCW 19.86.010(2); *Pang v. Farmers Ins. Co. of Washington*, *supra* at 39, 45.

**C. <u>Which Affects Public Interest</u>**

The first step in addressing this element requires the Court to determine whether the case is more properly characterized as a consumer dispute or a private dispute. *Travis v. Washington Horse Breeders Ass'n, Inc.*, *supra* at 406-07; *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, *supra* at 789-90. If it is possible or likely that other persons might suffer the same injury in exactly the same fashion, that changes the dispute from a private dispute to one that affects the public interest. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, *supra* at 790.

Once it has been determined that the transaction affects public interest, *Hangman* requires that five other questions be answered. They are:

1. Were the alleged acts committed in the course of defendant's business?
2. Are the acts part of a pattern or generalized course of conduct?
3. Were repeated acts committed prior to the act involving plaintiff?
4. Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff?

5. If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

*Travis v. Washington Horse Breeders Ass'n, Inc*., *supra* at 407; *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co*., *supra* at 790.

The answer to each question is "Yes." Plaintiff complains that defendants, a Peterbilt manufacturer and a Peterbilt authorized sales dealer, committed deceptive acts by failing to disclose that Peterbilt trucks are manufactured with an inherent defect that makes them susceptible to developing fuel leaks due to wear or failure of the line, which then creates a substantial risk that the truck will catch fire. This is something that occurs with some regularity, it is known to Peterbilt, and this fact is concealed when Peterbilt sells its trucks to the public. Given the fact that Peterbilt manufacturers and has been manufacturing and selling thousands of trucks over the years, it seems obvious that defendants engage in a continuous course of conduct in failing to disclose this fact to prospective purchasers. It is also clear from the boiler-plate printed forms that defendants engage in a continuous pattern of conduct in attempting to limit their liability for this, and other, defects by using disclaimers or waivers of warranties in an attempt to escape responsibility for this problem. These same facts also make it clear defendants must have been engaged in this concealing conduct both before and after they sold the Peterbilt truck in question to plaintiff. It is clear that this conduct not only is likely to occur in the future, but is probably occurring each and every time either a new or used Peterbilt is sold with this same defective fuel line anywhere in the United States. Finally, it is clear that this course of conduct will affect great numbers of the general public if it is allowed to continue.

There is another, greater, concern with defendants' concealing conduct. In this case, plaintiff's truck caught fire on a remote stretch of a rural highway in Kansas. This fire could have just as easily developed when Mr. Smith (or some other Peterbilt driver) was driving down an interstate in a major city (such as Los Angeles, Chicago or New York) during rush hour in heavy traffic. Mr. Smith may have had no way to get off the road and may have ended up trapped in midst of heavy traffic resulting in a fire that not only consumed his truck, as it did, but any other number of nearby vehicles. Instead of a property damage case, as it is presented here, it could have been a case where any number of persons could have been injured or killed in the resulting fire. That prospect clearly makes this case one which could affect many consumers.

**D. <u>A Showing of Injury to Plaintiff in His Business or Property</u>**

There can be no dispute that plaintiff meets this element. Even defendants do not contend otherwise. Plaintiff's truck caught on fire and was completely destroyed. He was put out of business until his truck could be replaced. *Pang v. Farmers Ins. Co. of Washington*, *supra* at 57-59.

**E. <u>A Causal Link Between the Unfair or Deceptive Act and the Injury Suffered.</u>**

Defendant Western Peterbilt actually contends that plaintiff cannot show a causal link between the failure to disclose the defect and the fire. (Defendant's Brief, pp. 20-21.) Put another way, defendant seems to be arguing that plaintiff would have spent thousands of dollars purchasing the truck even if he had been told there was a defect in the fuel line and the truck might catch on fire at any time and be completely destroyed.

It should go without saying that any reasonable person is not going to spend nearly $200,000 to purchase a truck if he is aware there is a substantial risk the truck may

catch fire at any time, because of a faulty fuel line, and be completely destroyed by fire. Even if the risk of fire was not great and the greatest threat to plaintiff was that the fuel line could rupture and leave plaintiff disabled and stranded on the road, that risk is still substantial and one which any reasonable consumer would want to consider before spending that much money for a truck. In any event, that is a fact question which must be resolved by a jury.

In addition, plaintiff has obtained both lay and expert testimony that Peterbilt trucks have a fuel line problem. This problem creates a real and substantial risk of fire. According to all the experts, even those presented by defendants, the most likely cause of the fire is some combination of a compromise of the fuel line that resulted in a fire. It was this fire that destroyed plaintiff's truck.

In any event, determination of proximate cause is a question of fact for a jury to determine. *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wash.2d 59, 84, 170 P.3d 10 (2007).

Plaintiff has presented a sufficient factual basis for its CPA claim to survive summary judgment and go to a jury. Defendants' motion for summary judgment on this issue should be denied.

**IV. THE WARRANTY DISCLAIMER IN THE LEASE AGREEMENT IS INVALID.**

Washington courts have an established set of rules regarding the validity of disclaimers of warranty or waiver of the same. Printed disclaimers of warranties in form contracts are not favoured. *Cox v. Lewiston Grain Growers, Inc.*, *supra* at 367; *Potter v. Wilbur-Ellis Co.*, 62 Wash. App. 318, 328, 814 P.2d 670 (1991); *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.*, *supra* at 542. They are strictly construed against the

seller. *Berg v. Stromme*, 79 Wash.2d 184, 196, 484 P.2d 380 (1971); *Thomas v. Ruddell Lease-Sales, Inc*., *supra.* These rules apply to commercial transactions as the one presently before the Court. *American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wash.2d 217, 223, 797 P.2d 477 (1990); *Cox v. Lewiston Grain Growers, Inc., supra* at 367-68.

Although a general disclaimer clause may negate implied warranties, this is only true in the case of a commercial seller and a commercial buyer, if there is a negotiated contract between the seller and buyer and the disclaim is one of the items negotiated. In other words, the evidence must show that the disclaimer was "explicitly negotiated between the buyer and seller and set forth with particularity showing the particular qualities and characteristics of fitness which are being waived." *Travis v. Washington Horse Breeders /Ass'n, Inc., supra* at 400; *Berg v. Stromme*, *supra* at 196; *Thomas v. Ruddell Lease-Sales, Inc. supra* at 46. In *Berg,* the court rejected the use of boiler-plate exclusions of all warranties, which is exactly what defendants in this case are attempting to do.

Furthermore, a disclaimer which is made after a sale is negotiated cannot be effective because it was not part of the bargain between the parties. *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co*., 28 Wash. App. 539, 543, 625 P.2d 171 (1981). Therefore, if there was no discussion of the disclaimer or the terms and conditions contained therein and the contract containing the disclaimer was not brought into the discussion until later, the disclaimer is invalid. That is exactly what occurred in this case.

Under Washington law, a disclaimer or waiver is ineffective unless: (1) it is explicitly negotiated between the buyer and the seller, and (2) it sets forth with

particularity the qualities and characteristics that are not being warranted. *Cox v. Lewiston Grain Growers, Inc.*, *supra* at 367-68; *Berg v. Stromme, supra* at 196; *Thomas v. Ruddell Lease-Sales, Inc*., *supra.* Defendant Western Peterbilt took none of those steps in this case.

Whether a particular set of facts renders an agreement containing a disclaimer is unconscionable, and therefore invalid, is question of law. *Potter v. Wilbur-Ellis Co.*, *supra* at 328; *Rottinghaus v. Howell*, 35 Wash. App. 99, 104, 666 P.2d 899, *rev. denied*, 100 Wash.2d 1016 (1983). That changes, however, if there are facts in dispute regarding how the warranty disclaimer came into existence.

This case is identical to the disclaimer at issue in *Potter v. Wilbur-Ellis Co.*, *supra.* In that case, plaintiffs claimed the language in the disclaimer, similar to the language in the instant case, was not discussed nor bargained for as part of the negotiation process. They claim the disclaimer was only injected into the process after a sales agreement had been made and they were presented with the paperwork. Defendant, on the other hand, relied on the written disclaimer which contained language, in boiler-plate form, that the disclaimer was "bargained for." The trial court denied defendant's attempt to obtain summary judgment. The appellate court agreed with the trial court, stating:

> However, the facts of this transaction, to which the court must apply the law, are disputed. The disclaimer at issue expressly recites it was bargained for and was part of a form (presumably an invoice) used numerous times between the parties. However, the Potters contend the disclaimer was not bargained for. This dispute raises a genuine issue of material fact to be submitted to a fact finder. The trial court correctly ruled the issue must await trial. . . .

*Id*. at 328-29.

This case is also similar to *Cox v. Lewiston Grain Growers, Inc.*, *supra* at 367. In that case, the buyer purchased a quantity of certified seed that, in fact, was not certified. In defence the company selling the seed attempted to assert a printed disclaimer of warranty similar to that present in the instant case. The trial court rejected the defence, which was affirmed by the appellate court. In do so, the court noted that the printed terms of the warranty disclaimer were never discussed or negotiated when the original sale was made. In fact, the printed disclaimer never appeared until later. Furthermore, the buyer was never made aware of the contents or terms of the warranty disclaimer. Finally, the court said it was significant that the parties had never previously conducted business with one another, which is the case here. The printed disclaimer was invalid.

The *Cox* court gave another reason that the warranty disclaimer in this case should be declared invalid—the terms of the disclaimer, if enforced, would make the entire sales transaction meaningless. The warranty in this case disclaims any responsibility for anything sold in this case. The langue is so broad that defendants are not selling anything to plaintiff except a hulk of metal, plastic and rubber. According to the disclaimer language, these defendants do not warrant anything on the entire truck. In fact, they do not even warrant that the truck will even run. If this language is enforced by the Court, plaintiff paid $115,000 for nothing. The "warranty"[1] states

> LESSOR LEASES THE EQUIPMENT TO LESSEE "AS IS" AND **MAKES NO WARRANTIES REGARDING THE EQUIPMENT, INCLUDING, BUT NOT LIMTED TO, THE BODY, ENGINE, TRANSMISSION, DRIVE TRAIN, ANDY OTHER MECHANICAL PARTS, THE ELECTRICAL SYSTEM, ANY ACCESSORIES AND ALL OPTIONS ON EQUIPMENT, WHETHER EXPRESS OR**

---

[1] It is a misnomer, or actually an insult, to call the language in question a "warranty." It warrants nothing. Read in its absolute terms, it really means that defendants are selling a truck to an unknowing purchaser and they have no responsibility or liability for the truck sold or anything that might happen because of the sale, regardless of how shoddy the truck might be.

> **IMPLIED, INCLUDING BUT NOT LIMITED TO PERFORMANCE GUARANTIES AND IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ALL OF WHICH ARE EXPRESSLY EXCLUDED**. Lessor shall **not be liable for any direct, indirect, incidental or consequential damages or losses resulting from the operation or use of the Equipment**. In addition, the **Lessor shall not be responsible for any loss, damage or claims caused by or attributable to any defect or deficiency in any Equipment whether arising out of the Equipment's manufacture, design or otherwise**.

(Ex. C., p.3)

In other words, defendant Western Peterbilt is not responsible for the quality of anything which is a part of the truck it sold plaintiff. It disclaims that anything on the truck works, including the engine, transmission, drive train or any other mechanical parts. It disclaims that the electrical system or any other part of the truck works. Further, Western Peterbilt disclaims that it is responsible for any damage which might result from any use of the truck or any defects in any form whatsoever that might exist when the truck is sold. In essence, according to defendants, plaintiff paid $115,000 for nothing.

What plaintiff got for $115,000 was close to nothing. Unbeknownst to him, the truck had a hidden defect that made the truck a ticking fire bomb. The truck, like many other Peterbilt trucks sold by defendants and running on America's highways, had an inherent defect in the fuel system. The fuel line on these trucks was cheap and weak. It was not mounted properly so it was subject to vibration and wear. This vibration allowed the fuel line to rub on other parts of the engine until it developed a hole and fuel escaped. When that happened, there was a high risk of a fire, such as the one plaintiff experienced. While not every fuel leak resulted in a fire, it was a significant risk. Most important, defendant Paccar knew about this problem because it happens frequently to Peterbilt

trucks. But no one ever told plaintiff, either before the sale, at the time of sale, or any time thereafter.

In *Cox,* the court stated:

> Even if the exclusionary clause were deemed conscionable, it is unenforceable if it fails its essential purpose. *American Nursery Prods*., 115 Wash.2d at 226, 797 P.2ds 477. When a limitation of remedy clause deprives a party of the substantive value of its bargain, it is ineffectual. *Marr Enters., Inc. v. Lewis Refrigeration Co*., 556 F.2d 951, 955 (9th Cir. 1977); see also U.C.C. § 2-719, official cmt. 1. A limitation of remedies fails its essential purpose when the defect is latent and non-discoverable upon reasonable inspection. . . .

*Id*. at 370. In the case at bar, the disclaimer clause holds defendants responsible for selling plaintiff a truck that has a frequent propensity to develop leaks in the fuel line that can result in fires which can destroy the truck in question, but any other property or persons that happen to be in close proximity. There is no way to know when this might happen. The defect is latent; therefore, inspection by plaintiff would have been futile. The only way plaintiff could have learned of this defect would have been if he had been told about it by defendants. Instead, defendants chose to remain silent, let plaintiff buy the truck and drive it, and let it catch on fire on the day in question. To let defendants to now walk away without incurring any responsibility for their concealment would be a miscarriage of justice.

If applied as written, the disclaimer clause makes the contract of sale illusory in the sense that plaintiff may not be buying anything of value. According to defendants, if the truck caught on fire and was destroyed the same day plaintiff drove it off the lot, defendants would not be responsible. Plaintiff assumes their position would be the same if the truck caught on fire and also caught other nearby cars and trucks on the highway as well, or, worse, injured and killed occupants of the truck or others who happened to be

nearby. The Court should declare the disclaimer clause invalid and unenforceable as a matter of law.

**V. AN IMPLIED WARRANTY OF MERCHANTABILITY AND IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE APPLY TO THE TRANSACTION INVOLVING THS TRUCK**.

This Court previously discussed Washington law regarding the implied warranties in this case. (Doc. #21, pp. 9-11.) The Court stated Washington law correctly; however, the Court then ruled that the plaintiff's claim on these theories should be dismissed because of lack of privity. As previously stated, the Court's ruling was incorrect in that regard because there is privity in this case S.O.F. ¶ 25. That ruling should be reversed and plaintiff's claims based on implied warranty reinstated.

Washington law provides that "[u]nless excluded or modified, a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. RCW 62A 2-316; *Testo v. Russ Dunmire Oldsmobile, Inc., supra.*

There is no question defendants in this case were a "merchant" under Washington law. RCW 62A 2-104; *Testo v. Russ Dunmire Oldsmobile, Inc., supra* at 43. They were in the business of selling trucks to the general public. Hence, implied warranties automatically attach to the sale, even for the sale of a used truck, such as the one in this case. Unless there is a valid exclusion or modification, a warranty of merchantability automatically attaches to the sale of all used motor vehicles in the State of Washington. *v. Russ Dunmire Oldsmobile, Inc., supra* at 43.

In *Thomas v. Ruddell Lease-Sales, Inc. supra*, the court stated that the implied warranty of merchantability applies to the sale of used motor vehicles. The court said

that "[t]o be merchantable goods must at least be such as pass without objection in the trade under the contract description, and fit for the ordinary purposes for which such goods are used." *Id.* at 214. The court continued:

> In the case of a used car, the warranty of merchantability insures that the car is in **reasonably safe condition** and substantially free of defects that render it inoperable. (Citations omitted,) Here, there was substantial evidence—Thomas's testimony—that the Corvette did not provide **safe transportation**. The trial court was entitled to believe Thomas. (Citations omitted,) Further, there was credible testimony that even an adequate repair would leave the frame weak. Therefore, as respects the vehicle's operating and **safety qualities** also, the finding of a nonconformity premised on breach of warranty is fully supported by substantial evidence. (Bold added,)

*Id.* at 215.

Under Washington law, a buyer does not waive any implied warranties that normally attach to goods unless he has had an opportunity to thoroughly inspect the goods and the inspection would have revealed defects which might affect the implied warranties. RCW 62A 2-316(3)(b); *Testo v. Russ Dunmire Oldsmobile, Inc*., *supra* at 44-5. That did not occur in this case.

In *Testo,* the court ruled that implied warranties were not waived because of the inspection rule. An inspection or test drive would not have revealed that the frame to the car had been bent in an accident and repaired. *Id*. at 45. The facts in this case make the same result even more compelling. Here, the defect (a faulty fuel line) was even more latent. No amount of inspection at the time of sale would have revealed that eventually the fuel line would rub against other parts of the engine until the line developed a hole that would allow fuel to leak onto the hot engine block, or become ignited by a spark, and cause the fuel (and ultimately the truck itself) to catch on fire.

Plaintiff's claims for implied warranty of merchantability and fitness for particular purpose should be reinstated. When a truck erupts in flames and is burned up because of a leak in a fuel line, the implied warranties applicable to such a transaction have been breached. The issue should be presented to the jury, along with plaintiff's claims under the WCPA.

## VI. PLAINTIFF CONCEDES IT HAS NO VALID EXPRESS WARRANTY CLAIMS IN THIS CASE.

Defendant Western Peterbilt argues that the express warranty claims should be dismissed. (Defendant's Brief, pp. 22-24.) Plaintiff concedes that it does not have any valid claims for express warranty under the facts of this case and permits the Court to dismiss the same.

## CONCLUSION

For the reasons set forth herein, plaintiff moves the Court to deny defendant Western Peterbilt's Motion for Summary Judgment on its Washington Consumer Protection Act violation claims. It further moves the Court to reinstate its claims for breach of implied warranty of merchantability and fitness for a particular purpose. It concedes the express warranty claims should be dismissed.

Respectfully submitted,

LAW OFFICES OF ELDON L. BOISSEAU, L.L.C.

By: s/Eldon L. Boisseau

Eldon L. Boisseau, SC #08022
Attorney for Plaintiff K R Smith Trucking LLC
River Park Place
727 N. Waco, Ste. 265
Wichita, KS 67203
(316) 613-2800 Telephone

(316) 613-2801 Facsimile
Email: Eldon@boisseau.com

**CERTIFICATE OF SERVICE**

I do hereby certify that on this 28th day of December, 2010, the above and foregoing received service by electronic filing with the United States District Court:

Patrick J. Murphy
Wallace, Saunders, Austin, Brown & Enochs, Chartered
400 O.W. Garvey Building, 200 W. Douglas
Wichita, KS 67202
Attorney for Western Peterbilt, Inc

Matthew K. Holcomb
Hinkle Elkouri Law Firm L.L.C.
8621 E. 21st Street, North, Suite 200
Wichita, Kansas 67206-2991
Attorney for PACCAR Inc and Peterbilt Motors Company

And the original notice electronically filed with the Clerk of the U.S. District Court with copies to counsel.

LAW OFFICES OF ELDON L. BOISSEAU, L.L.C.

By:_________s/Eldon L. Boisseau___________________

Eldon L. Boisseau, SC #08022
Attorney for Plaintiff K R Smith Trucking LLC
River Park Place
727 N. Waco, Ste. 265
Wichita, KS 67203
(316) 613-2800 Telephone
(316) 613-2801 Facsimile
Email: Eldon@boisseau.com